Clyde CONAWAY, Plaintiff-Appellant,

v.

Edward C. SMITH, Director, Neighborhood Preservation Department of City of Kansas City, Kansas; M. James Medin, City Administrator of the City of Kansas City, Kansas; and the City of Kansas City, Kansas, a municipal corporation, Defendants-Appellees.

No. 85–2914.

United States Court of Appeals, Tenth Circuit.

Aug. 2, 1988.

Gail A. Bruner of Carson & Fields, Kansas City, Kan., for plaintiff-appellant.

Daniel B. Denk of McAnany, Van Cleave & Phillips, Kansas City, Kan., for defendants-appellees.

Before McKAY, ALARCON,* and MOORE, Circuit Judges.

PER CURIAM.

Plaintiff-appellant brought this action against defendants-appellees claiming they had violated his First Amendment right to free speech and Fourteenth Amendment right to due process by wrongfully discharging him from public employment. Defendants thereafter filed a motion for summary judgment, which the district court granted. Plaintiff appeals this judgment and argues that genuine issues of material fact exist as to his liberty and property interest due process claims and as to his First Amendment claim.

## I. *Factual Background*

Clyde Conaway, plaintiff, was hired on July 27, 1982, by the City of Kansas City, Kansas, as an electrical inspector in the Building Inspection Division of the Neighborhood Preservation Department. At the time he was hired, no written or oral contract of employment was entered into stating the terms, conditions, or duration of his employment.

According to Conaway's verified complaint, several work-related problems arose during the next two years. First, Conaway and his partner were ordered by their immediate supervisor, Robert Wiggins, to perform certain campaign work for the mayor on city time or for compensatory time off. Second, Conaway claims problems developed because he refused to approve or "release as operational" substand-

* The Honorable Arthur L. Alarcon, Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

ard electrical work in certain community development projects, often in opposition to his immediate supervisor's demands. Finally, Conaway alleges that he made public charges against Robert Wiggins and John Mendez, his supervisors, for ordering him to perform electrical work during city time on their homes and the homes of their friends and relatives, sometimes without the proper permits and licenses.[1]

Conaway was suspended for thirty days on March 16, 1984, for the stated reason that he had threatened his immediate supervisor, Robert Wiggins. On April 3, 1984, Conaway was notified by a letter from Ed Smith, Department Director, that he could return to work after his suspension but was subject to a six-month probation period. While on probation, Conaway was warned he would be immediately terminated for any further "serious misconduct."

The events which led up to Conaway's ultimate dismissal began on May 25, 1984. Conaway was instructed to perform an electrical inspection of the Highland Park baseball fields. He discovered several electrical violations which were dangerously exposed to the public and refused to approve the facility as operational. Upon informing his new supervisor, Lyle Fisher, of the violations, Fisher instructed him to release the facility as operational and to perform a follow-up inspection the next week. Conaway released the electrical job to the Board of Power and Light, but also told the company about the existing violations, which they agreed to fix. Upon reinspection on Friday, June 1, 1984, Conaway found that the violations had not been corrected. Returning to the office that Friday afternoon to report the problem, Conaway found Fisher was not available.[2] Conaway

prepared a written report concerning the violations which also criticized Fisher's release of the facility due to the danger it posed to the public. He submitted this report on Monday morning, June 4, 1984, to Fisher, to Edward Smith, Director of the Neighborhood Preservation Department, and to James Medin, City Administrator.

Thursday, June 7, 1984, Fisher called Conaway into his office and requested him to sign a letter of reprimand for his failure to immediately notify Fisher on June 1st about the Highland Park violations. Conaway claims that the letter also contained allegations that Conaway had lied on a previous occasion when he testified against the City for a coemployee. Conaway refused to sign the letter, tore it into pieces, and left the office. That same day, Fisher wrote a memorandum to Smith, recommending that Conaway be terminated immediately for his failure to follow instructions and for the insubordinate act in tearing up the letter of reprimand. On June 13, 1984, Smith wrote a memorandum to Medin, informing the City Administrator of his decision to terminate Conaway because of Conaway's attitude toward his supervisor and refusal to perform work assignments. The termination was approved by the Medin on June 14, 1984, for the stated reason of insubordination.

After a formal grievance proceeding, the Board of Review affirmed Conaway's discharge, based on his act of insubordination while on probation. In a later hearing, a referee for the State of Kansas Department of Human Resources, Division of Employment, reviewed defendant's denial of Conaway's unemployment benefits. After hearing testimony by Conaway and Fisher,[3] the referee found Conaway's discharge did not demonstrate a breach of duty owed to

---

1. It appears the news media followed Conaway to Mendez's home and took pictures of him working on an appliance. Later, the news reporters approached Conaway for a statement on the subject. Conaway also spoke with James Medin, the City Administrator about the matter. The charges prompted an investigation which resulted in suspension and demotion of the Chief Building Inspector, Robert Wiggins, a thirty-day suspension of the Supervisor of the Building Inspection Division, John Mendez, and

Conaway alleges, resulted in his own suspension.

2. Defendants have never alleged that Fisher was available on this particular afternoon.

3. The referee's statement of facts included the following sentence: "[T]he employer also maintains that the claimant's conduct was aimed at embarrassing his immediate supervisor."

the employer, and further found a lack of any willful intent on the part of Conaway to go against the authority of his supervisors. He, therefore, held that Conaway was eligible for benefits.

Thereafter, Conaway filed a verified complaint claiming the City of Kansas City, Ed Smith, and James Medin had violated his constitutional rights by wrongfully terminating him. One year later, defendants moved for summary judgment on several grounds, including qualified immunity, failure to state a claim, and absence of any material issue of fact regarding the constitutional claims.

In granting defendants' motion for summary judgment, the district court concluded: (1) Conaway had neither a property nor a liberty interest protected by the Fourteenth Amendment which requires a pretermination hearing, and (2) Conaway's First Amendment rights were not violated because his speech was not protected under the First Amendment. Having decided the motion on these grounds, the district court dispensed with any discussion of defendants' other arguments. We affirm in part and reverse in part.

## II. *Standards of Review*

In reviewing the order of summary judgment issued below, this court does not apply the clearly erroneous standard of Fed. R.Civ.P. 52, but instead views the case in the same manner as the trial court.[4] Thus we must examine the record to determine whether any genuine issue of material fact pertinent to the ruling remains, and if not, whether the substantive law was correctly applied. Fed.R.Civ.P. 56. *Western Casualty & Sur. v. National Union Fire Ins. Co.*, 677 F.2d 789 (10th Cir.1982).

In responding to defendants' motion for summary judgment, Conaway relied heavily on specific facts he had asserted in his verified complaint to support his First Amendment claim. Although a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in his pleadings, a verified complaint may be treated as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e). *See McElyea v. Babbitt*, 833 F.2d 196 (9th Cir.1987); *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77 (5th Cir. 1987); *Hooks v. Hooks*, 771 F.2d 935 (6th Cir.1985); *Lew v. Kona Hospital*, 754 F.2d 1420 (9th Cir.1985); *Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir.1965). Rule 56(e) requires that the affidavit be based on personal knowledge, contain facts which would be admissible at trial, and show that the affiant is competent to testify on the matters stated therein. Conaway's verified complaint as to the factual allegations in support of his free speech claim meets these requirements.

Conaway did not rely solely on the "mere" pleadings to oppose the motion for summary judgment regarding his free speech claim. In addition to the factual allegations stated in his verified complaint, Conaway submitted certain documentary evidence to substantiate his claim. Conaway also identified other documents, photos and evidence to corroborate his rendition of the events which evidence was inexplicably missing from the files of the Building Inspection Division and was therefore unavailable to him. Under these circumstances, we will treat the verified complaint as an affidavit for the purpose of the motion for summary judgment. We note that

4. Summary judgment is a drastic remedy. We have cautioned that any relief pursuant to Fed. R.Civ.P. 56 should be awarded with care. *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir.1973). The burden is on the moving party to show the absence of a genuine issue of material fact. Pleadings and other evidence must be viewed in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Rea v. Wichita Mortgage Corp.*, 747 F.2d 567, 573 (10th Cir.1984). How-

ever, a nonmoving party may not rely merely on the unsupported or conclusory allegations contained in pleadings to rebut the movant's factual proof in support of the motion for summary judgment. The party opposing the motion must respond with specific facts demonstrating genuine issues requiring resolution at trial. Unless the moving party can demonstrate his entitlement beyond a reasonable doubt, summary judgment must be denied. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir.1980).

there may be cases where the sole reliance on a verified complaint would be insufficient to meet a nonmoving party's burden under *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), especially when the allegations contained in the pleading are merely conclusory. In this case, however, a full affidavit would serve no better purpose than the sworn, detailed, factual allegations contained in the verified complaint that were based on Conaway's personal knowledge. We see no reason, under these particular circumstances, to demand that Conaway must re-label his verified complaint as an affidavit and submit essentially the same facts to the court.

### III. *Due Process*

■ Conaway's first claim of error concerns the deprivation of the liberty and property interest without due process. Procedural due process requires a pretermination hearing where liberty or property interests protected by the Fourteenth Amendment are implicated. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 567, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972). A plaintiff must first establish, however, that there is a protected interest at stake.

> A public employee facing discharge is entitled to the safeguards of procedural due process only if he can demonstrate that the termination implicates a property or liberty interest protected by the Due Process Clause; if a property or liberty interest is not implicated, "he must settle for whatever procedures are provided by statute or regulation."

*Sipes v. United States,* 744 F.2d 1418, 1420 (10th Cir.1984).

#### A. *Property Interest*

■ Determination of whether a plaintiff has a property interest is a question of state law. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* Kansas case law recognizes a property interest in public employment when the employee is hired for a definite term. An employee hired for an indefinite term is an "at will employee," whose contract may be terminated at any time by either party. An at will employee has no property interest in employment.

Defendants have established through affidavits and deposition testimony that Conaway never had an oral or written contract with the city for permanent employment. They have further shown that there are no facts from which an implied contract can be inferred. We find defendants have met their initial burden of showing there are no material issues of fact as to the existence of a property interest.

■ In response, Conaway maintains an implied contract for continued employment may have existed for two reasons. First, he received a letter from Ed Smith which informed him, during his probation, he would be immediately terminated for any further serious misconduct. In addition, Conaway claims he "expected to remain employed as long as [he] performed the duties of [his] employment properly." To have a property interest, a person "must have more than a unilateral expectation, but, must instead, have a legitimate claim of entitlement to the interest." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. It is apparent that these facts indicate nothing more than a unilateral expectation on the part of Conaway. Placing an employee on probation, without more, indicates only an employer's intention to discipline, and not an intention to create an implied contract.

■ Second, Conaway alleges he was given an employee handbook when he was hired. The State of Kansas recognizes that termination procedures in an employment manual "may be one of the relevant cir-

cumstances from which an implied contract can be inferred." *Rouse v. Peoples Natural Gas Co.*, 605 F.Supp. 230, 232 (D.Kan. 1985) (citing *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779, 782 (1976)). Conaway failed, however, to produce the manual, describe its contents, or allege that it influenced his decision to accept the position. In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial. *Bryant v. O'Connor*, 848 F.2d 1064, 1067 (10th Cir. 1988); 28 Federal Procedure, L.Ed. § 62: 538 (1984). The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party.[5] The litigant must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980).

Kansas law holds that a unilateral expression in a personnel manual, which is not bargained for, cannot alone be the basis for an employment contract. *Rouse v. Peoples Natural Gas Co.*, 605 F.Supp. at 232. Conaway has failed to show any specific facts from which an implied contract may be inferred. Having failed to raise any facts supporting a property interest, we find summary judgment is proper as to Conaway's property interest claim.

B. *Liberty Interest*

"The concept of liberty recognizes two particular interests of a public employee: 1) the protection of his good name, reputation, honor, and integrity, and 2) his freedom to take advantage of other employment opportunities." *Miller v. City of Mission, Kan.*, 705 F.2d 368 (10th Cir. 1983); *Weathers v. West Yuma County School Dist. R–J–1*, 530 F.2d 1335, 1338

(10th Cir.1976). For an employee to make a successful liberty deprivation claim, in addition to proving one of the above-recognized interests, he must also show that his dismissal resulted in the publication of information which was false *and* stigmatizing. *Sipes v. United States*, 744 F.2d at 1421.

In the present case, nothing in the record suggests that appellant's good name, reputation, honor, or integrity was stigmatized. Conaway only generally alleges that he has suffered damage to his personal and business reputation due to the city's false accusations and wrongful termination. No specific facts are asserted to support this claim.

The reasons for Conaway's discharge, neglect of duties and insubordination, even when considered false, do not call into question his good name, reputation, honor, or integrity. In comparison, a liberty interest might be implicated by charges of "dishonesty or immorality" because such charge might seriously damage his standing and associations in the community, *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707, but not by charges of insubordination. *See Sullivan v. Stark*, 808 F.2d 737, 739 (10th Cir.1987) (charge that park ranger was negligent or derelict in performing his duties did not implicate liberty interest); *Asbill v. Housing Authority of Choctaw Nation*, 726 F.2d 1499 (10th Cir.1984) (charge of disputing authority of a new agency director held not to stigmatize discharged employee); *Sipes v. United States*, 744 F.2d at 1422 (discharge for tardiness, unreliable behavior, and horseplay not a liberty interest infraction); *Stritzl v. U.S. Postal Service*, 602 F.2d 249, 252 (10th Cir.1979) (poor work habits and low productivity held not to implicate liberty interest).

Conaway failed to present any facts that indicate he experienced any disadvantage in obtaining other employment or that he

---

5. Defendants provided an affidavit by their Benefits Supervisor stating no employee handbook was distributed during the time Conaway was employed. They also produced a copy of the company personnel policy manual, which was distributed only to department heads. Nothing in the manual expressly provides for a fixed term of employment nor is there language from which a contract to that effect could be inferred. On the contrary, the manual states employees may be terminated with or without cause.

had been foreclosed from other employment opportunities. The label of insubordination, although somewhat of a negative reflection on a person, is not the type of stigma that seriously damages that person's ability to take advantage of other employment opportunities. Absent any evidence that Conaway's attempts to obtain other employment have been hindered by the charge of insubordination, we find that no protected liberty interest was infringed.

Because no reasonable inference of a property or liberty interest can be drawn from Conaway's complaint and supplemental evidence, summary judgment is appropriate as to the due process claims.

## IV. First Amendment

Conaway also asserts a First Amendment claim, arguing that the City terminated him not for the stated reason of insubordination, but in retaliation for his criticism of his supervisors' actions. Conaway contends several work-related incidents contributed to defendants' decision to terminate him. First, Conaway made public comments about Robert Wiggins, the Chief Building Inspector, and John Mendez, Supervisor of the Building Inspection Division, concerning work he was requested to perform on city time for city officials and their friends and relatives, often without the required permits and license.[6] Conaway claims he reported the questionable activities to James Medin, the City Administrator, and responded to media personnel who questioned him on the subject. Sec-

ond, Conaway reported a series of activities involving Lyle Fisher which might have indicated illegal payoffs or kickbacks. Finally, Conaway argues that his termination was directly related to his criticism of Fisher. The week before he was terminated, Conaway sent a written report, dated June 4, 1984, to Ed Smith and James Medin advising them that Fisher had overruled his decision to reject the electrical work at Highland Park baseball fields. Conaway claims he wrote the report out of his concern for public life, health, and safety.[7]

Under *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the plaintiff in a retaliation case must demonstrate that (1) the speech was constitutionally protected and (2) the speech was a substantial or a motivating factor in the state's detrimental action. *Id.* 429 U.S. at 287, 97 S.Ct. at 576; *Wren v. Spurlock*, 798 F.2d 1313, 1317 (10th Cir.1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987). In determining whether a public employee's speech warrants First Amendment protection, the court must first consider whether the speech related to a matter of public concern, meaning the speech can be "fairly considered as relating to any matter of political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). If the speech is of public concern, the court must then balance the interests of the public

6. In addition, Conaway objected to and allegedly made public disclosure of his being ordered by Robert Wiggins to work on the mayor's campaign for reelection in exchange for city compensation time. In the *Connick* case, the Supreme Court explicitly stated that pressure to work on political campaigns was a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 149, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983). Likewise, Conaway's speech touched on his supervisor pressuring employees to work on political campaigns. The subject matter is of public concern. Conaway fails, however, to provide any facts of how he communicated his objection to doing campaign work. Without any specific facts describing the form or context of the speech, we cannot find this instance constitutes "speech" of public concern under the First Amendment.

7. Conaway also claims his termination was motivated by his refusal to "play ball" within the Building Inspection Division by accepting money in exchange for favorable inspection reports. Plaintiff alleges that on his last day of work before he was terminated, Smith entered his office and strongly suggested Conaway should cease rejecting certain electrical jobs on community projects in return for some tax-free money. Conaway claims he refused to participate in such activity. Plaintiff fails to allege, however, that he communicated these activities to anyone until after he was terminated. Absent any explicit communication, we are unable to find the circumstances involve "speech" under the First Amendment. This testimony may be relevant, however, in determining defendants' motive in terminating Conaway.

employee, as a citizen, in commenting upon matters of public concern against the interests of the public entity, as an employer, in promoting efficiency of the public service it performs. *Wilson v. City of Littleton, Colo.,* 732 F.2d 765 (10th Cir.1984).[8]

Under *Connick v. Myers,* whether an employee's speech addresses a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147–48, 103 S.Ct. at 1690. Considering the content, form, and context of the speech at issue in the present case, Conaway's complaints of government misconduct constitute matters of public concern.

■ Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import. *See, e.g., Southside Pub. Schools v. Hill,* 827 F.2d 270 (8th Cir.1987); *Daniels v. Quinn,* 801 F.2d 687, 690 (4th Cir.1986); *Cox v. Dardanelle Pub. School Dist.,* 790 F.2d 668, 672 (8th Cir.1986); *Marohnic v. Walker,* 800 F.2d 613 (6th Cir. 1986); *Knapp v. Whitaker,* 757 F.2d 827, 840 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *Brasslett v. Cota,* 761 F.2d 827 (1st Cir.1985); *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983); *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir.1983); *Key v. Rutherford,* 645 F.2d 880 (10th Cir.1981). Courts have focused on the motive of the speaker in analyzing whether the speech qualifies as a matter of public concern, *i.e.,* whether the speech *was calculated* to disclose mis-

conduct or dealt with only personal disputes and grievances with no relevance to the public interests. *See Koch v. Hutchinson,* 847 F.2d 1436, 1445–46 (10th Cir.1988) (en banc) (and cases cited therein); *Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987).

■ Conaway's expression of potential wrongdoing did not address internal policies relevant only to department personnel nor involve essentially a private matter, but concerned information in which the public would definitely be interested. *See Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076, 1079–80 (4th Cir.1987) (*citing Berger v. Battaglia,* 779 F.2d 992, 998–99 (4th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986)). Nor was Conaway's speech motivated solely by personal interest or hostility, but was primarily for the purpose of informing his superiors of what he perceived to be improper and illegal conduct.[9] Unlike the plaintiff in *Connick,* Conaway sought to inform his superiors that the Building Inspection Department was not properly discharging its governmental responsibilities. Conaway reported to his superiors facts which appeared to involve special favors for government officials, illegal payoffs, and circumstances of released substandard electrical work which, he felt, posed danger to public life, health, and safety. In all three incidents, Conaway sought "to bring to light actual or potential wrongdoing or breach of public trust on the part of a public officer." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691.

---

**8.** The first element, including both the public concern and balancing issues, raises questions of law. *Wren v. Spurlock,* 798 F.2d at 1317; *Connick v. Myers,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7. The second element of the plaintiff's case, whether the state's action was motivated by the employee's conduct, raises a question of fact for the jury. *Wren v. Spurlock,* 798 F.2d at 1317; *see also, Knapp v. Whitaker,* 757 F.2d 827, 845 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 8 L.Ed.2d 29 (1985).

**9.** The district court made reference to a statement Conaway made while out drinking with Robert Wiggins. Conaway said he would "kick his [Wiggins] butt." Depending on the context of his statement, its meaning could vary widely.

The only evidence presented pertaining to context is that the two men were out drinking. We do not believe this statement, standing alone, demonstrates that Conaway's motivation in speaking out was for purely personal interest or vindictiveness. *Cf. Fiorillo v. United States Dept. of Justice,* 795 F.2d 1544, 1550 (Fed.Cir.1986) (speech held to be purely vindictive); *McMurphy v. City of Flushing,* 802 F.2d 191 (6th Cir. 1986) (revenge was primary motivation for speaking out). Furthermore, the comment relates only to the expressions concerning the special favors Conaway was requested to perform by Wiggins and Mendez and does not pertain to any situation involving Lyle Fisher.

The form and context of Conaway's expression also comes within the "rubic of matters of public concern." *Connick*, 461 U.S. at 148, 103 S.Ct. at 1690. The record shows that Conaway privately spoke to the City Administrator about each incident of alleged official misconduct. Although he was approached by the media regarding the gratuitous work performed for friends and relatives of his superiors, it appears Conaway did not go to the media on his own initiative until after he was terminated. The fact that Conaway chose a private forum, rather than public, to express his concerns, does not remove it from First Amendment protection. *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414–16, 99 S.Ct. 693, 695–97, 58 L.Ed. 2d 619 (1979) (teacher's complaints and criticism of school policies and practices communicated privately to principal held protected by First Amendment); *see also Rankin v. McPherson*, — U.S. ——, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (statement made privately to coworker held to be matter of public concern); *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 46 (2d Cir.1983) (nursing director's allegations of corrupt and wasteful practices communicated to HHC inspector obviously involved a matter of public concern). We conclude that the speech at issue here directly addresses matters of public concern.

The second step of the First Amendment test concerns the *Pickering* balancing test, wherein the employee's interest in free comment upon matters of public concern is weighed against the state's interest in the efficiency of its public services. *Pickering v. Board of Educ. of Township High School Dist. 205, Will County, Ill.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed. 2d 811 (1968). Under the *Pickering* test, Conaway's First Amendment rights are protected "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Wren v. Spurlock*, 798 F.2d at 1318, (citing *Childers v. Independent School Dist. No. 1 of Bryan County, Okla.*, 676 F.2d 1338, 1341 (10th Cir.1982); *Accord National Gay Task Force v. Board of Educ.*, 729 F.2d 1270, 1274 (10th Cir.1984), *aff'd*, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985)). The extent of the government's burden varies, depending on the nature of the employee's expression. Speech which involves clear public concern may merit a greater degree of First Amendment protection. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692.

When balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption. *See Foster v. Ripley*, 645 F.2d 1142, 1149 (D.C. Cir.1981). Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests. Each of Conaway's expressions in the present case involved some impropriety on the part of his government supervisors. The facts alleged in Conaway's verified complaint may correctly be described as a whistle blowing situation. *See also O'Brien v. Town of Caledonia*, 748 F.2d 403 (7th Cir.1984); *Brockell v. Norton*, 732 F.2d 664 (8th Cir.1984); *Atcherson v. Siebenmann*, 605 F.2d 1058 (8th Cir.1979).

The Supreme Court recognizes as pertinent factors of the *Pickering* test "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 107 S.Ct. at 2899. The court should also consider the employee's position within the work force, the manner, time, and place of the employee's expression, and the context in which the dispute arose. *Id.* 107 S.Ct. at 2898.

We first consider the impact of Conaway's speech on the Building Inspection Division. Disruptions in the working relationship between Conaway and his supervisors, and general disharmony in the office, are foreseeable consequences when an employee reports improper activities of co-

workers or supervisors.[10] We recognize, as did Justice Powell in his concurring opinion in *Rankin*, "that a public employer must have authority to maintain the efficiency as well as the integrity of his office." *Rankin*, 107 S.Ct. at 2899 n. *. We also recognize, however, the vital interest the public has in the integrity of those who administrate their government. *Brockell v. Norton*, 732 F.2d at 668. It would be anomalous to hold that because the employee's whistle blowing might jeopardize the harmony of the office or tarnish the integrity of the department, the law will not allow him to speak out on his perception of potential improprieties or department corruption. *See Porter v. Califano*, 592 F.2d 770, 773 (5th Cir.1979).

Protecting an employer's interest in preventing disruptions in the office or interference with department functions is most important in an agency where loyalty and confidence are essential to close working relationships. Although confidence and loyalty are attributes which help any office function more efficiently, a building inspection department does not involve as close a working relationship as, for example, a police department, *Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 880 (4th Cir. 1984); a fire department, *Koch v. Hutchinson*, 847 F.2d at 1452 n. 22; the F.B.I., *Egger v. Phillips*, 710 F.2d 292, 319 (7th Cir.), *cert denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); or a district attorney's office, *Connick*, 461 U.S. at 151, 103 S.Ct. at 1692. The limited importance of loyalty and confidence in the Building Inspection Division further diminishes the city's interest in preventing interference with departmental functions.

An additional factor under the *Pickering* test is whether the content of Conaway's speech calls into question his general competence to perform his responsibilities. As noted earlier, defendants have not challenged the accuracy of Conaway's statements in any significant way nor otherwise questioned his ability to perform his job.

*Cf., Koch v. Hutchinson*, 847 F.2d at 1452–53 (report written by plaintiff omitted important evidence which raised question of plaintiff's competence or possible official misconduct). No evidence in the record suggests that Conaway's statements reflected negatively on his ability to adequately perform.

Nor does Conaway's former position as an electrical inspector in the Building Inspection Division persuade us that the government's interest outweighs Conaway's First Amendment rights. Under *Rankin*, an employee whose duties include a "confidential, policymaking, or public contact role," must be more cautious with what he says. 107 S.Ct. at 2900. Although Conaway had some limited public contact as an electrical inspector, his position did not entail authority or a public accountability role which might be affected by his internal complaints to his superiors.

We finally address the manner, time, and place of Conaway's expressions. He privately spoke with Medin about the gratuitous favors he performed for Wiggins and Mendez, and the apparent payoffs involving Fisher. Later, he submitted a written report to Fisher, Smith, and Medin concerning the Highland Park electrical problems. There is no evidence that Conaway openly confronted Fisher in front of other employees or otherwise addressed coworkers about his concerns. *Cf. Connick*, 461 U.S. 153, 103 S.Ct. at 1693 (plaintiff circulated questionnaire about supervisors to coworkers). In each instance, it appears that Conaway used less disruptive internal channels, rather than going outside the city administration. The relatively low key context in which Conaway voiced his complaints further persuades us that the *Pickering* balance tilts in his favor.

This case resembles *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41 (2d Cir. 1983), in which a director of nursing wrote a report to the corporation's inspector general complaining of certain corrupt and

---

**10.** The record is devoid of any affidavit or other evidence tending to show Conaway's speech had an actual or potential effect of disruption within the Building Inspection Division. Nor is there any allegation that Conaway's statements were false, which might further disrupt office harmony.

wasteful practices at a large municipal hospital. The practices included issuance of permits to unlicensed nurses, abuses of nurses' sign-in hours, and double payment for overlapping shifts in different departments. The court held allegations of corruption and malfeasance were obviously matters of public concern and constitutionally protected. The court found no suggestion that the speech impeded the nurse's ability to perform her job or that it impaired the regular operation of the hospital. The court further found the nurse attempted to minimize any disruption of working relationships. *Id.* 710 F.2d at 47; *See also O'Brien,* 748 F.2d at 407 (police officer's right to discuss his perception of potential graft and corruption in police department with his attorney, chief county judge, and FBI held to be deserving of vigilant First Amendment protection); *Brockell v. Norton,* 732 F.2d at 668 (city, mayor, and councilors violated police dispatcher's First Amendment rights by dismissing him for reporting alleged misconduct of police officer to a person outside departmental chain-of-command); *Atcherson v. Siebenmann,* 605 F.2d at 1063 (internal letter alleging misappropriation of public funds by coworkers found to be a matter of compelling public concern).

Without any demonstrated adverse impact on the employer's operations apart from the general type of disruption noted by this court above, and in consideration of the importance of protecting reports of government misconduct, we hold Conaway's First Amendment interest in the speech at issue in this case outweighs the governmental interest at stake. We, therefore, conclude that the three incidences of speech are protected by the First Amendment.

■ Having concluded that Conaway's speech is constitutionally protected, we must now address whether the speech was a substantial or motivating factor in plaintiff's dismissal. The evidence presented in the record indicates a material issue of fact exists as to defendants' motivation in terminating Conaway. Conaway submitted documents and a verified complaint, which alleged specific facts based on personal knowledge, to show that he was terminated for reporting the improper activities of his supervisors. Conaway's personal account of the events which led to his dismissal must be accepted as true. On June 4th, Conaway submitted a report to Fisher, Smith, and Medin describing the Highland Park electrical violations and criticizing Fisher's release of the allegedly hazardous electrical work. Three days later, Fisher presented Conaway with a written reprimand and requested that Conaway sign the document. Although the parties dispute what actually occurred during the meeting, the evidence ties Fisher's reprimand to the very events about which Conaway had criticized Fisher. Immediately after this meeting, Fisher recommended Conaway be dismissed. In a later hearing concerning Conaway's unemployment benefits, Fisher indicated that Conaway's purpose in writing the June 4th report was to embarrass Fisher. *See* note 3, *supra.* Conaway also claimed he had a disagreement with defendant Smith the day before he was dismissed which, if accepted as true, puts Smith's motivation in recommending Conaway's termination under suspicion. *See* note 7, *supra.*

Reasonable inferences can be drawn from these facts that Fisher and Smith were at least partially motivated by Conaway's criticism of his supervisor's actions and his speech concerning what he perceived as definite problems in the Building Inspection Division. Based on this evidence, when viewed in a light most favorable to the plaintiff and considering the credibility factor involved, we conclude a jury might return a verdict in Conaway's favor on this issue. *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. at 2514; *Exnicious v. United States,* 563 F.2d 418 (10th Cir. 1977). Summary judgment is, therefore, inappropriate.

The decision of the district court is AFFIRMED IN PART and REVERSED IN PART and the case is REMANDED for further proceedings consistent with this opinion.