**Dennis L. HOOPER, Plaintiff,**

v.

**POLYCHROME, INC., Defendant.**

**Civil Action No. 94–2262–EEO.**

United States District Court,
D. Kansas.

Feb. 15, 1996.

Patricia A. Sexton, Baker, Sterchi & Cowden, Kansas City, MO, R. Douglas Gentile, Phillip C. Rouse, Douthit, Frets, Rouse & Gentile, Kansas City, MO, for plaintiff.

Allan L. Bioff, Brian J. Finucane, Sharon D. Hess, Bioff, Singer & Finucane, Kansas City, MO, Barbara A. Harmon, David J. Waxse, Shook, Hardy & Bacon, Overland Park, KS, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on plaintiff's motion for class action certification (Doc. # 12), plaintiff's motion to stay determination of the class action certification (Doc. # 27), and defendant's motion for summary judgment (Doc. # 29). The court has reviewed the parties' briefs and is now prepared to rule.

### Factual background

The following facts are uncontroverted or deemed admitted for purposes of the instant motion, pursuant to Federal Rule of Civil Procedure 56(c) and District of Kansas Rule 56.1.[1] Plaintiff was employed as an engineer by Polychrome Systems, a division of defendant Polychrome, Incorporated. Polychrome Systems operated two facilities in the Metropolitan Kansas City area—one in North Kansas City, Missouri, and one in Lenexa, Kansas. These two facilities were located 27 miles apart.

Polychrome Americas, a separate division of Polychrome, Inc., was located in Lenexa, Kansas, in the same building as Polychrome Systems. Polychrome Americas employed thirty-three people who performed marketing, sales, and service functions for various companies which manufactured plate processing equipment, including Polychrome Systems. Bill Palafox, Director of Technical Operations, was responsible for the management of the Polychrome Americas operation at the Kansas site.

The Polychrome Systems facility in Missouri was a manufacturing plant, which produced plate and film processing equipment. Sixty-four people were employed at the Missouri facility. Charlie Barton, Director of Manufacturing, was responsible for the management of the Missouri manufacturing operation. He was generally assigned to the Missouri facility, but worked at the Kansas facility on occasion.

The Polychrome Systems facility in Kansas was the administrative support office, which performed product development, accounting, and human resource functions for Polychrome Systems. The product development function included manufacturing, production, and quality control issues. Thirty-one employees of Polychrome Systems worked at the Kansas facility.

Daryl Farr, Vice President of Operations for Polychrome Systems, oversaw both the Kansas and Missouri facilities. Alice Zibers, VP of Human Resources and Administration, and Todd Sprague, Document Coordinator, maintained offices at both facilities. Payroll for both facilities was handled at the Kansas facility.

Polychrome Systems employees were generally assigned to one of the two facilities, but were required to travel to the other facility to perform their job duties on occasion. Specifically, Kansas employees travelling to Missouri included: Dwayne Massey (Controller), Ron Rodvelt (Director of Electrical Engineering), John Maliszewski (Director of Mechanical Development), plaintiff Dennis Hooper (Senior Mechanical Engineer), and the switchboard operator.[2] In addition, a few Kansas employees temporarily relocated to the Missouri facility to work on the development of specific projects.

Missouri employees travelling to Kansas included: Charlie Barton (Director of Manufacturing), Delbert Coonfare (Senior Assemblyman), Jim Staats (Project Leader), Brian McReaken (Manufacturing Process Engineer), and Tom Swartz (Director of Material

---

1. We note that the parties' joint motion dated December 8, 1995 (Doc. # 77) indicates that plaintiff's December 11, 1995, filing will complete the briefing on defendant's summary judgment and render it ready for ruling. We, therefore, assume that the references to outstanding discovery in plaintiff's earlier briefs have been resolved and the motion is submitted on a complete record on the single site issue.

2. During his deposition, plaintiff named fifteen other Kansas employees who travelled to Missouri, but did not include their positions or titles. Plaintiff's Deposition at 153.

Control).[3] A delivery driver, Randy Reavis, who was generally assigned to the Missouri site, made one or more trips daily between the two facilities.

Equipment maintained and used exclusively at the Missouri manufacturing facility included: four CNC machining centers, approximately 10 smaller machine shop units, welding equipment, printing equipment, assembly tools, a licensed computer network system, a licensed computer aided design ("CAD") system, and a telephone system. Equipment maintained and used exclusively at the Kansas administrative facility included: a separate licensed computer network system, a separate licensed CAD system, a separate telephone system, and some engineering tools.

Equipment used at both facilities included: engineering tools (specifically, a digiscope, torque analyzer, oscilloscope, machinist's transit, and laser interferometer); and personal computers. The main blueprints of engineering drawings were kept in the Kansas facility and provided to the Missouri facility when needed. Parts were also sometimes transferred between the two facilities.

Polychrome treated the two facilities as one operating unit in some instances. For example, documents by Polychrome, Inc., refer to the combined Kansas City operation as "Systems." Also, Daryl Farr compiled monthly operations summaries which covered the operations of both facilities. The company handbook referred to "Polychrome Systems Division" as follows:

> [T]wo high-tech companies quite recently have enabled Polychrome to establish a Systems Division on a very firm foundation. Rachwal Systems, Inc., manufacturers of projection platemaking systems, was acquired in 1986, followed a year later by the acquisition of Opti–Copy, Inc., a Lenexa, Kansas company producing prepress imaging systems. These two companies have since been combined into one, as Polychrome's Systems Division, headquar-

tered in Lenexa. The System Division's manufacturing arm in North Kansas city— formerly known as Epic Manufacturing— now officially is the manufacturing department of the Division.

Polychrome reimbursed employees who travelled between facilities for their travel expenses. As requested by Polychrome, employees frequently carpooled when travelling between facilities.

On June 30, 1993, defendant instituted a reduction in force which resulted in the termination of fifty-three Polychrome Systems employees—thirty-six at the Missouri facility and seventeen at the Kansas facility. Eleven Polychrome Americas employees were also terminated on that date. Polychrome, Inc., did not provide the 60–day notice required under the WARN Act to any of the terminated employees.

### Discussion

#### I. Class action certification

Plaintiff has moved to stay the class action certification until after the summary judgment motion is decided. Defendant opposes plaintiff's motion to stay, arguing that the class should be certified before the summary judgment motion is decided so that all class members would be bound by a ruling adverse to the class. There is some support for defendant's position. *See Washington v. Aircap Indus. Corp.,* 831 F.Supp. 1292, 1294 (D.S.C.1993) (discussing certification under Rule 23(b)(1) in a WARN Act case); *but see Roberts v. American Airlines, Inc.,* 526 F.2d 757, 762–63 (7th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) (by moving for summary judgment prior to the class determination and the sending out of class notice, the defendants "assumed the risk that a judgment in their favor would not protect them from subsequent suits by other potential class members.") After carefully considering all of the circumstances of the instant case, the court concludes that we need not reach the

---

**3.** In his deposition, plaintiff discussed nineteen Missouri employees who worked at the Kansas facility at one time or another. On the present record, it is difficult for the court to discern the employees involved and their titles. The other employees named by plaintiff include: Scott Bennett, Bob Ward, Michael Powers, Dave Thornsberry, Joe Morvistka, Leroy Clubine, Becky Ketner, and Greg Hitzeman. Plaintiff's Deposition at 63.

certification issue in light of our ruling on defendant's motion for summary judgment. Accordingly, plaintiff's motion for class certification will be denied as moot.

## II. Defendant's motion for summary judgment

### A. Summary judgment standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Essentially, the inquiry as to whether an issue is genuine is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. This inquiry necessarily implicates the substantive evidentiary standard of proof that would apply at trial. *Id.* at 252, 106 S.Ct. at 2512.

Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus.,*

*Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir. 1988). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D.Kan. Rule 56.1.

Defendant seeks summary judgment on two grounds. First, defendant argues for application of a six-month statute of limitations, under which plaintiff's claims would be barred. Second, defendant argues that the WARN Act does not apply because the reduction in force did not result in job loss to fifty employees at a single site.

### B. Statute of limitations

■ We can quickly dispose of defendant's statute of limitations argument. It appears from the parties' joint motion dated December 8, 1995 (Doc. # 77), that defendant abandoned its statute of limitations argument after the Supreme Court decided the issue in *North Star Steel Co. v. Thomas,* —— U.S. ——, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995). However, we are not aware of any motion by defendant to withdraw the statute of limitations argument as a basis for the summary judgment motion. Accordingly, we will address it briefly.

Defendant contends the six-month statute of limitations of the National Labor Relations Act, 29 U.S.C. § 160(b) ("NLRA") applies.

In *North Star Steel*, — U.S. at —–—, 115 S.Ct. at 1930–32, the Supreme Court held that state law, rather than federal law, supplies the limitations period for civil actions brought to enforce WARN. *See also Frymire v. Ampex Corp.*, 61 F.3d 757, 763–64 (10th Cir.1995) (holding that the statute of limitations for breach of contract claims applies to civil WARN Act claims). Plaintiff filed within a year of the accrual of his cause of action—plaintiff was laid off as a part of the reduction in force on June 30, 1993, and filed suit on June 30, 1994. Thus, under either the three-year statute of limitations for breach of implied employment contract claims in Kansas, Kan.Stat.Ann. § 60–512, or the five-year statute of limitations applicable to employment contracts in Missouri, Mo. Rev.Stat.Ann. § 516.120, plaintiff's claim would not be barred.[4] Accordingly, defendant's motion for summary judgment based on the NLRA statute of limitations will be denied.

## C.  Single Site of Employment

■ Defendant's second summary judgment ground is that the WARN Act does not apply because the threshold number of employees were not involved in the layoff on June 30, 1993. Defendant argues that plaintiff has failed to present evidence to establish that fifty employees at a "single site of employment" were terminated, as required by 29 U.S.C. § 2101. Plaintiff contends that, based on the uncontroverted facts of this case, summary judgment may be granted in his favor or, at a minimum, that the issue should be presented to the trier of fact. We acknowledge that this case presents a close question with respect to whether the two facilities are a "single site." However, after a careful review of the entire record (liberally construed in the light most favorable to plaintiff) and the relevant cases, we conclude that the manufacturing and administrative facilities were two separate sites of employment.

■ The WARN Act prohibits an employer from ordering "a plant closing or mass layoff without providing each employee, either individually or through her representatives, with sixty-days advance notice." *Frymire*, 61 F.3d at 764 (citing 29 U.S.C. § 2102). "A 'mass layoff' refers to a reduction in force which results in an employment loss at a single site of employment during any thirty-day period for fifty or more employees who comprise at least 33% of the total number of employees at that particular site." *Id.* at 765 (citing 29 U.S.C. § 2101(a)(3)). "Employers who fail to provide the requisite notice must compensate employees suffering an employment loss for each day of the violation." *United Steelworkers of America v. Crown, Cork & Seal Co.*, 32 F.3d 53, 55 (3d Cir.1994), *aff'd sub nom., North Star Steel Co. v. Thomas*, — U.S. ——, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995).

Because the WARN Act does not define a "single site of employment," we must look to the legislative history of the Act and the regulations promulgated by the Secretary of Labor in interpreting "single site of employment." *See Frymire*, 61 F.3d at 765. The legislative history of WARN indicates that Congress changed all references to "place of employment" to "single site of employment" in order to "clarify that geographically separate operations are not to be combined when determining whether the employment threshold for triggering the notice requirement is met." *International Union, United Mine Workers v. Jim Walter Resources, Inc.*, 6 F.3d 722, 727 (11th Cir.1993) (citing *United Paperworkers Local 340 v. Specialty Paperboard, Inc.*, 999 F.2d 51, 56 (2nd Cir.1993)).

The regulations, in pertinent part, provide as follows:

(1) A single site of employment can refer to either a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from

---

4. In defendant's Reply in Support of Motion for Summary Judgment, defendant indicates that it anticipates filing a motion for summary judgment based on Kan.Stat.Ann. § 44–1005(i) and Mo.Rev.Stat.Ann. § 213.075(1). To date, the court is not aware that any such motion has been filed. Furthermore, in light of *Frymire*, we question the merit of any such motion.

one another, may be considered a single site of employment.

(2) There may be several single sites of employment within a single building, such as an office building, if separate employers conduct activities within such a building. For example, an office building housing 50 different businesses will contain 50 single sites of employment. The offices of each employer will be a single site of employment.

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites in the same geographic area which do not share the same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate workforces are considered separate single sites of employment.

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

\*    \*    \*    \*    \*    \*

(8) The term "single site of employment" may also apply to truly unusual organiza-

tional situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

20 C.F.R. § 639.3(i).

In *Frymire,* the Tenth Circuit discussed the regulations as follows:

> Taken together, these regulations suggest that proximity and contiguity are the most important criteria for making single site determinations. They, in fact, establish whether a site will be presumed a single or multiple site. However, once a court makes the contiguous/non-contiguous determination, the operational, managerial and labor variables become the decisive factors and can defeat or reinforce the presumptions established by the proximity and contiguity factors.

61 F.3d at 766. The factors set forth in the regulations are not exclusive and other factors or criteria may also be relevant to the single site determination. *Id.* at 766 n. 7.

*Frymire* involved two manufacturing plants which were separate, wholly-owned subsidiaries of the defendant parent company. *Id.* at 762. The two plants were located 150 feet apart and, at one time, were part of a single operation that grew to require additional space. The court held that although the two plants were "geographically almost contiguous" and there was some unity and common design, they were single sites of employment for purposes of the WARN Act. *Id.* at 767. In reaching this conclusion, the court stressed the following factors: (1) generally separate management; (2) the absence of common employees between the two corporations;[5] and (3) the fact that the two plants were separate corporations which produced distinct products.

In the present case, the two facilities are non-contiguous and are geographically separated by twenty-seven miles. Thus, each is presumed to be a single site. *Id.* at 766. Plaintiff attempts to overcome the presumption of separate sites by presenting evidence of shared management, equipment, and em-

---

**5.** The court disregarded evidence presented to the contrary by the defendant because "taken in its larger context [it] fail[ed] to persuade." *Frymire,* 61 F.3d at 767.

ployees, and of a common operational purpose.

■ Plaintiff alleges common management in that Daryl Farr, Vice President of Operations, oversaw both facilities. However, plaintiff does not controvert that each facility had separate managers who reported to Farr. Common corporate management does not render two sites a "single site of employment." *See Jim Walters Resources*, 6 F.3d at 727. As the court in *Frymire* found, although there was some "overlap and coordination of otherwise distinct managerial responsibilities" and "some instances of common management," the two facilities at issue here were, "by and large, separately managed" on a day-to-day basis. 61 F.3d at 766; *see also Jim Walter*, 6 F.3d at 726 (day-to-day management and personnel are the "essence of WARN").

■ In an attempt to establish a shared workforce, plaintiff states that employees generally assigned to one of the two facilities "regularly" worked at the other facility. Even assuming that a significant number of employees of either facility spent a portion of their time at the other facility, we cannot equate this periodic occurrence with the "shifting," "rotating" or even "sharing" of a non-"separate" workforce as contemplated in 20 C.F.R. § 639.3(i)(3), (4), (5). *See Frymire*, 61 F.3d at 767. In the present case, there is no evidence that the manufacturing laborers were shifted or rotated to the Kansas facility. At best, plaintiff presents evidence that engineers generally assigned to the Kansas facility worked at the manufacturing facility at various times on specific projects, and that key employees in the manufacturing process attended fairly regular meetings at the Kansas facility to provide technical input into the design process of new products. We believe that "shifting," "rotating," or "sharing" of a shared workforce on a "regular" basis requires more—it contemplates the regular exchange of employees who perform the same or similar operational functions. *See* 20 C.F.R. § 639.3(i)(3) (giving an example of operations in non-contiguous buildings which constitute a single site as involving a warehouse company which "regularly shifts or rotates the *same* employees

from one building to another.") *See also Marques v. Telles Ranch, Inc.*, 867 F.Supp. 1438 (N.D.Cal.1994) (multiple lettuce-harvesting locations constituted a single site of employment where the employees and equipment were moved between the sites and the same foremen and supervisors were involved at all locations).

Plaintiff also alleges that computer equipment, engineering equipment, and parts were shared by the two facilities. Plaintiff presents evidence that a CAD computer terminal and engineering equipment belonging to the Kansas facility were used at the Missouri facility. Even so, we do not believe that the use of isolated pieces of equipment by engineering employees to periodically perform tasks at the Missouri facility mandates a determination of "single site" status. Similarly, plaintiff's evidence that parts were transported from the Missouri facility to the Kansas facility for use in prototypes and in servicing equipment previously manufactured at the Missouri facility does not evidence "shared equipment" at a level sufficient to require a determination of single site status. There is no evidence that the manufacturing machinery, which was integral to the manufacturing process at the Missouri facility, was ever transported to the Kansas facility. In short, there is insufficient evidence that equipment integral to the day-to-day business operations of a particular facility was shared with the other, as contemplated by 20 C.F.R. § 639.3(i)(3).

Plaintiff attempts "to blur the distinction between a single site and a single employer." *Jim Walter*, 6 F.3d at 725. "An employer may have one or more sites of employment under common ownership or control." 20 C.F.R. § 639.3(a)(4). While the two facilities were certainly related to one another, they independently performed different functions. The purpose of the Missouri facility was to manufacture products, while the purpose of the Kansas facility was to provide administrative support. The fact that certain administrative and engineering support functions for the manufacturing facility occurred at the Kansas facility, and that the interrelationship of the two divisions sometimes caused certain employees to work at the other facility, does

not change our conclusion that the two facilities were two separate and distinct sites of employment for purposes of the WARN Act.

Plaintiff also argues that the two facilities constitute a "truly unusual organizational situation." *See* 20 C.F.R. § 639.3(i)(8). In *Carpenters Dist. Council of New Orleans v. Dillard Dept. Stores, Inc.,* 15 F.3d 1275, 1290 (5th Cir.1994), the court found that two noncontiguous locations were a single site of employment for WARN Act purposes where some of the employees of a corporate division were relocated to relieve overcrowding, but the employees continued to perform the same functions after the relocation. The instant case is readily distinguishable in that it does not involve a relocation of part of a single site to alleviate overcrowding. Interestingly, the court in *Dillard* noted that the retail store and the corporate division housed in the same location were two sites of employment for purposes of the WARN Act. *Id.* at 1289 n. 21. The instant case is analogous in that it involves a manufacturing operation and its administrative support office. We see nothing "truly unusual" about Polychrome's organizational structure, i.e., a manufacturing operation in one site and an administrative support office in a separate, noncontiguous site, even if it requires frequent visits to the manufacturing site by support staff employees and periodic visits to the administrative facility by key manufacturing employees.

In conclusion, plaintiff bears the burden of proof to show that the threshold requirements for application of the WARN Act have been met. Even under our very liberal construction of the evidence in the instant case, we hold as a matter of law that the two separate manufacturing and administrative sites do not constitute a "single site of employment" for purposes of the WARN Act.

IT IS THEREFORE ORDERED that plaintiff's motion for class action certification (Doc. # 12) is denied as moot.

IT IS FURTHER ORDERED that plaintiff's motion to stay determination of the class action certification (Doc. # 27) is denied as moot.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Doc. # 29) is granted.