**Scott KEPHART, et al., Plaintiffs,**

v.

**DATA SYSTEMS INTERNATIONAL, INC., Defendant.**

No. CIV.A.01–2533–KHV.

United States District Court, D. Kansas.

Jan. 16, 2003.

Frank B. W. McCollum, Stacy M. Murrow, McCollum & Parks, L.C., Kansas City, MO, for Plaintiffs.

William C. Martucci, Stacey A. Campbell, Shirley E. Goza, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Scott Kephart, Harold Distler, John Winger, Darrell Robinson, Robert Babich, Mark Hernandez, Scott Strange and James Rubino bring claims against Data Systems International, Incorporated ("DSI") for violation of the Worker Adjustment And Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 *et seq.*, in connection with the termination of their employment. Distler, Winger, Babich, Strange and Rubino also assert claims for breach of contract and *quantum meruit*, and Distler, Winger and Babich assert additional claims for violation of the Kansas Wage Payment Act, K.S.A. §§ 44–315(a) and 44–344(a).

This matter is before the Court on *Defendant Data Systems International, Inc.'s Motion For Summary Judgment* (Doc. # 39) filed July 12, 2002 and *Plaintiffs' Motion For An Evidentiary Hearing Or In The Alternative For Leave To Respond To Defendant's Reply To Plaintiff's [sic] Brief In Opposition To Summary Judgment* (Doc. # 60) filed September 16, 2002. For reasons stated below, the Court sustains defendant's motion in part and overrules plaintiffs' motion.

### *Summary Judgment Standard*

■ The usual and primary purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The non-moving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. *See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *See Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

■ The Court may only consider evidence whose content or substance is admissible. *See Conoco Inc. v. J.M. Huber*, 148 F.Supp.2d 1157, 1166 (D.Kan.2001); *see also Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir.1995). "Hearsay testimony that would be inadmissible at trial may not be included." *Conoco*, 148 F.Supp.2d at 1166. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. Statements not based on personal knowledge must be disregarded. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set

forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir.1995).

■ Initially, the Court must address DSI's motion to strike portions of the affidavit of Mark Hernandez for non-compliance with Fed.R.Civ.P. 56(e).[1] DSI asserts that the affidavit includes information of which Hernandez lacks personal knowledge, and that it is self-serving and conclusory. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). To enforce this rule, the Court will not strike the affidavit but shall simply disregard those portions which are not shown to be based upon personal knowledge. *See Chambless v. Masters, Mates & Pilots Pension Plan*, 571 F.Supp. 1430, 1459 (S.D.N.Y.1983).

■ Hernandez was director of DSI's southwest region, and he supervised William Allen, Daniel Ellis, Darrell Robinson, Steven Robinson and Paul Jonas. He worked for DSI from July of 1994 through April 30, 2001. To the extent that his affidavit relates to his job position and supervisory duties, it is presumably based upon personal knowledge. The affidavit, however, does not explain how or why Hernandez would have personal knowledge on other subjects. To that extent, Hernandez's affidavit shall be disregarded.[2] *See* Fed.R.Evid. 602 & 701; *PAS Comm.*,

---

1. Defendant only asks the Court to strike specific numbered paragraphs, and the Court assumes that the remaining statements have sufficient basis.

2. The Court disregards the following paragraphs: 21, 22, 35, 37, 39, 41, 97, 98, 100,

101, 104, 106, 107, 109, 110, 112, 113, 114, 117, 119, 120, 122, 123, 131, 133, 134, 135, 146 and 147. *See Hernandez Affidavit*, Exhibit 1 in Vol. II *Brief In Opposition To Defendant's Motion For Summary Judgment* ("*Brief In Opposition*") (Doc. # 51) filed August 12, 2002.

*Inc. v. Sprint Corp.*, 139 F.Supp.2d 1149, 1174 (D.Kan.2001).

### Factual Background

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiffs:

### I. DSI And Its Employees

DSI is an "employer" under the WARN Act.[3] It sells computer-related services, programs and equipment, and has its corporate headquarters in Overland Park, Kansas ("the Overland Park site"). Before April 30, 2001, DSI sold computer systems for original equipment manufacturers such as IBM and Hewlett Packard, created and marketed its own proprietary products and provided technical and consulting services. In 2000 and 2001, DSI told employees that its gross margins were lower on commodity hardware sales than on other products and that as a result of its performance, it had to cut expenses. DSI terminated certain groups of employees in December of 2000 and on April 30, 2001, it terminated 87 additional employees nationwide.[4] DSI told most of these employees that the reason for termination was "restructuring at DSI," in that management had decided to "get out of the commodity hardware reselling business." *Brief In Opposition* (Doc. # 51) at 39. Specifically, DSI stated that:

[f]aced with a tough economy and a significant drop in hardware revenues, the Company has decided to accelerate our strategic plan to become focused on the profitable segments of our software and services lines of business. As a result, the Company is eliminating those positions associated with hardware sales and support and those segments of our services business deemed non-strategic.

Appendix F to Plaintiffs' Interrogatories in Exhibit A in *Brief In Opposition* (Doc. # 51).

The Overland Park site, consists of two buildings which have the same mailing address. On April 30, 2001, the site had 262 employees. Of the 87 employees whom DSI terminated nationwide on that date, 46 were assigned to the Overland Park site.[5] The parties disagree whether any of the remaining 41 employees were assigned to Overland Park. Plaintiffs assert that in all, DSI terminated 59 employees at that site—46 who the parties agree were assigned to Overland Park, plus 13 others. *Brief In Opposition* (Doc. # 51) at 42. DSI did not provide WARN Act notices to any of the terminated employees.

### A. DSI Organization

DSI has regional headquarters offices in Illinois, Connecticut, Georgia and Califor-

---

**3.** Under the WARN Act, an "employer" is "any business enterprise that employs ...100 or more employees, excluding part-time employees...." 29 U.S.C. § 2102(a)(1)(A).

**4.** Plaintiffs claim that DSI terminated 87 employees: 73 in Commodity Hardware Reselling ("CHR"), five in Customer Relationship Management ("CRM") and eight in other units. Plaintiffs' math is confusing, here and elsewhere. For example, even though plaintiffs claim that DSI terminated 87 employees, plaintiffs' fact number 22 purports to list 85 employees and in fact lists only 84. Plaintiffs' fact number 39, which lists employees whose site of employment was Overland Park, skips

from employee number 38 to employee number 40. Plaintiffs' fact number 44, which lists employees who live outside the Kansas City metropolitan area, is missing at least two employees (Gilbert Martinez who lives in California and Frank Filling who lives in Pennsylvania). The Court has attempted to derive accurate and consistent numbers from the underlying documentation, but has been unable to do so. For the sake of this order, the Court assumes that DSI terminated 87 employees.

**5.** The parties disagree whether two of the 46 employees (Michael Elmquist and Matt Lanigan) were terminated.

nia. In addition, DSI has leased regional office space in Overland Park, Kansas, Oak Brook, Illinois, Bloomington, Minnesota, Dallas, Texas, Danbury, Connecticut and Houston, Texas. DSI also has employees who work directly out of designated work spaces in their homes, and it generally provides all equipment, furniture and phone lines which are necessary for these home offices.

According to Hernandez, DSI had four principal operating units from January to April 2001: Wireless (Data Collection), Commodity Hardware Reselling ("CHR"), Software, and Services. *Hernandez Affidavit*, ¶ 151, Exhibit 1 in Vol. II *Brief In Opposition* (Doc. # 51). According to DSI's organizational chart, however, DSI was divided into four "essential" divisions on April 26, 2001: finance and support, sales and marketing, client services and technology development.[6] The organizational chart does not reflect the products and services or the functions of the persons whom it identifies, but it does indicate that divisions were divided into subdivisions. Under client services, for example, DSI had a subdivision titled "CRM, business development" with six employees at the Overland Park site. The CRM subdivision provided consulting services to clients who were interested in computer software for customer relationship management. DSI's organizational chart does not list a CHR unit, but various plaintiffs (Kephart, Distler, Winger, Darrell Robinson and Babich) submitted affidavits that DSI assigned them to a CHR unit in the sales and marketing division. Hernandez submitted an affidavit that a CHR unit existed, that he was part of it and that it consisted of 92 employees—including five plaintiffs and ten other employees (William Allen, Daniel Ellis, Renee Garcia, Paul Jonas, Otha Kinnear, Dana Marti–Dykes, Gary Pierce, Steven Robinson, Beau Sharbrough and Donald Sutherland) who supported and serviced CHR business at locations around the country.

On April 30, DSI terminated five of the six employees, who worked in the CRM unit at Overland Park. DSI did not terminate Ron Jenkins, who managed the CRM unit, but he did no CRM-related work after April 30. On April 30, DSI terminated 73 of the 92 employees whom it had assigned to the CHR unit nationwide.[7] The 87 employees who were terminated nationwide included 78 in CRM and CHR,[8] and nine in finance and support or client services.

## B. DSI Home And Regional Offices

Employees who reside outside the Kansas City metropolitan area utilize DSI leased space or home offices.[9] DSI agrees to pay for office space, equipment, phone set-up, expenses and other work-related

---

6. The record does not reveal any correlation between DSI "operating units" (as Hernandez uses the term) and "divisions" (as DSI uses the term).

7. The record does not reveal the fates of the remaining 19 employees.

8. As previously noted, plaintiffs claim that DSI terminated 59 employees at the Overland Park site. According to plaintiffs, 47 of these 59 employees actually worked at Overland Park (36 in CHR, five in CRM and six in other units or divisions). Plaintiffs claim that 12 additional CRM employees were outstationed from Overland Park and assigned to Overland Park for purposes of the WARN Act. DSI claims that it terminated only 44 employees at the Overland Park site and that it did not have a CHR unit.

9. Plaintiffs disagree with DSI's description of these spaces as "home offices," asserting that the spaces "are not in fact 'offices' as that term is commonly used." *Brief in Opposition* (Doc. # 51) at 23. Plaintiffs, however, do not define how the term "offices" is commonly used or give specific facts to show why DSI's definition is misleading.

items which are required to set up a home office. The DSI Telecommuting Handbook ("Handbook") sets out guidelines and qualifications for a home office. Employees do not qualify for a home office unless their jobs involve working independently from others.[10] A home office must accommodate a work space that is outside the family's normal traffic pattern. If an entire room is not available, the employee must designate a specific, clearly definable area as the home office work space. Like employees at any DSI office, home office employees are required to keep regular work hours (Monday through Friday from 8:00 a.m. to 5:00 p.m.), access DSI computer systems through a dial-in or VPN system[11] and maintain ergonomically correct and safe offices. DSI reserves the right to inspect home offices to ensure that they meet safety standards.

DSI employees who use home offices report to supervisors who are located at the Overland Park site or other regional offices, and they generally are required to travel. When they travel, they usually leave from and return to their home offices. DSI employees who reside outside the Kansas City metropolitan area may visit the Overland Park site hundreds of times a year or not at all.

As noted, plaintiffs claim that DSI terminated 59 employees from the Overland Park site. The Overland Park work site is undisputed as to 46 of these employees. The parties dispute the assigned employment sites of the remaining 13 employees: eight client solutions executives, one solutions developer manager, three solutions

developers and one client support representative.

### 1. Eight Client Solutions Executives

Seven employees at issue in this case—William Allen, Daniel Ellis, Paul Jonas, Dana Marti–Dykes, Darrell Robinson, Steven Robinson and John Winger—were client solutions executives in the sales and marketing division. Their primary duties were to solicit business, sell DSI products and services, and communicate with DSI customers. Hernandez, who was director of the southwest region and was stationed at Overland Park, supervised five of these employees: Allen (who resided in Houston and serviced DSI customers in Houston and Louisiana), Ellis (who resided in San Antonio, Texas and serviced DSI customers in Texas), Jonas (who resided in Dallas and serviced DSI customers in Texas), Darrell Robinson (who resided in Springfield, Missouri[12]) and Steven Robinson (who resided in Fort Smith, Arkansas and serviced customers in Arkansas and Oklahoma). Allen and Ellis utilized DSI office space in Houston, Jonas utilized DSI office space in Dallas, and Darrell Robinson and Steven Robinson worked at their homes. Darrell Robinson used his own telephone and desktop computer, with a postage meter, facsimile machine, laptop computer and printer which DSI provided. DSI paid for telephone lines at his home. Darrell Robinson traveled to Overland Park five to seven times a year and he met with DSI clients at their places of business on a bi-weekly basis. Ellis contacted the Over-

---

**10.** Independent work is not the only criteria; some employees whose jobs involve independent work utilize DSI leased space.

**11.** The record does not define a VPN system, but the Court assumes that it refers to a virtual private network—a set of computers on a public network (such as the internet) that can communicate among themselves

with encryption technology, so that their messages are safe from interception by unauthorized users, as if the computers were connected by private lines.

**12.** The record does not reveal the area in which Darrell Robinson serviced DSI customers.

land Park site daily, sometimes as many as ten times.[13]

Mike Murphy, who was director of the central region and was stationed at Overland Park, supervised two of these seven employees: Marti–Dykes (who resided in Phoenix, Arizona and serviced DSI customers in Arizona) and Winger (who resided in Morrison, Colorado and serviced DSI customers throughout the mountain region of the United States). Marti–Dykes and Winger had home offices. Winger used his own telephone and desktop computer, with a postage meter, facsimile machine, laptop computer and printer which DSI provided.[14] DSI paid for four telephone lines at Winger's home. Winger traveled to Overland Park five to seven times a year and met with DSI clients at their places of business on a bi-weekly basis. Winger communicated with Overland Park as much as ten times a day.

The eighth client solutions executive was Kim Dickerman.[15] Mike Jurczak, who was director of the midwest region and was stationed at Oak Brook, Illinois, supervised Dickerman.

All of the client solutions executives had telephone extensions at the Overland Park site from which they retrieved messages.

### 2. One Solutions Developer Manager

Beau Sharbrough, a resident of Grapevine, Texas, worked as a solutions developer manager in the sales and marketing department. He utilized DSI office space in Dallas and Overland Park, spending an average of three days each week at Overland Park. From January to April 2001, Sharbrough was responsible for managing client accounts throughout the United States. John Rockeman, who was vice president of client solutions development and was stationed at Overland Park, supervised Sharbrough.

### 3. Three Solutions Developers

Renee Garcia, Gary Pierce and Otha Kinnear were solutions developers in the sales and marketing department. They worked in home offices and communicated with DSI customers throughout the United States. All three had telephone extensions at Overland Park. Latecia Mills, who was director of solutions development services and was stationed at Overland Park, supervised Garcia (a resident of Denver, Colorado) and Pierce (a resident of San Francisco, California). Beau Sharbrough, a solutions developer manager at Dallas and Overland Park, supervised Kinnear (who resided in Dallas). Kinnear used DSI office space in Dallas.

---

**13.** The record does not provide consistently detailed information about the work arrangements and travel responsibilities of each disputed employee.

**14.** Among other things, the terms of Winger's employment offer stipulated that DSI was responsible for:

 1. Expenses for Technical & Marketing Support (From Kansas City)

 2. Telemarketing Support (From Kansas City)

 3. Mailings and Seminars Support (From Kansas City)

 4. Administrative and Contracts Support (From Kansas City).

*Brief In Support Of Defendant Data Systems International, Inc.'s Motion For Summary Judgment ("Defendant's Brief")* (Doc. # 40) filed July 12, 2002 ¶ 45. Winger was required to "[t]ravel to Kansas City at least 3 times/year for sales reviews & training." *Id.* In 1997 and 1999, Winger served as DSI's registered agent in Colorado and his residence was the registered office for DSI.

**15.** Plaintiffs refer to this employee as both Kim Dickerson and Kim Dickerman, but Dickerman appears to be the correct name. The record does not indicate Dickerman's job duties. The parties dispute where Dickerman lived and whether he worked in Oak Brook, Illinois or Overland Park, Kansas.

#### 4. One Client Support Representative

Donald Sutherland, a resident of Oklahoma City, Oklahoma, was a client support representative in the sales and marketing department. He worked at home but had a telephone extension at Overland Park, and he communicated with DSI customers throughout the United States. Debbie Walther, manager of client support, supervised Sutherland from the Overland Park site.

#### C. Terms Of Employment For Distler, Winger, Babich, Strange and Rubino

Distler, Winger, Babich, Strange and Rubino assert claims for breach of contract and *quantum meruit.* Distler, Winger and Babich assert additional claims for violation of the Kansas Wage Payment Act, K.S.A. §§ 44–315(a) and 44–344(a). When they were contemplating employment, DSI gave each of these five employees a "Terms of Employment Offer." Terms of employment, including commissions and bonuses, varied with each position and job location. Some "Terms of Employment Offers" included language about compensation and commissions and bonuses, while others did not. The "Terms of Employment Offers" for all five plaintiffs included the following notice:

> *Important:*
>
> Bonuses and incentive compensation, if any, is paid solely at the discretion of DSI Management. The amount of funding and criteria for determining individual bonus allocations is subject to fluctuation and change along with changing business interests of DSI and possible fluctuations in the financial performance of the company as a whole. Salary and merit increases and company benefits policies are subject to change without notice.

*Defendant's Brief* (Doc. # 40) ¶ 59.

#### 1. Harold Distler

From August 1, 1996 to April 30, 2001, Distler worked as a senior systems consultant and solutions developer in AS/400 (a subdivision of the sales and marketing division) at the Overland Park site. Distler's "Terms of Employment Offer" did not specifically mention commissions or performance bonuses. *See* Tab 16 in *Exhibits In Support Of Defendant Data Systems International, Inc.'s Motion For Summary Judgment ("Defendant's Exhibits")* (Doc. # 41) filed July 12, 2002. As a solutions developer, Distler initially earned performance bonuses under a solutions development compensation plan.[16] On January 24, 2001, Distler learned that instead of bonuses, DSI would pay solutions developers a five per cent commission on gross profits under the 2001 Solutions Development Compensation Plan ("2001 Comp Plan").[17] The 2001 Comp Plan stated that commissions would be earned when:

- Cash for the transaction has been received by DSI
- DSI understands and agrees to any and all cost incurred as part of the transaction
- No outstanding contingencies exists [sic] that could alter the terms of the transaction or cause DSI to refund or credit all or part of the money received.

*Defendant's Brief* (Doc. # 40) ¶ 57. When Rockeman announced the 2001 Comp Plan

---

**16.** The record does not include the compensation plan which was in effect when Distler began work for DSI in 1996. It appears that Distler was a solutions developer the entire time that DSI employed him (1996–2001), but the record is not that specific.

**17.** The record does not specify whether Rockeman announced the plan itself at that time.

on January 24, 2001, he did not state that to receive a commission, a solutions developer had to be employed on the date when DSI received customer payment. On April 8, 2001, however, Rockeman e-mailed the 2001 Comp Plan to Distler. Distler did not sign the 2001 Comp Plan or orally agree to any requirement that to qualify for a commission he had to be employed on the date of customer payment. In fact, Distler was not aware of any such condition until he received Rockeman's e-mail on April 8, 2001.[18]

Distler solicited and obtained orders for equipment and services with Ball Corporation ("Ball"), SYSCO Food Services ("SYSCO") and Forest T. Jones. DSI invoiced these customers from January through April of 2001 and received payments in May, June and July of 2001—after it had terminated Distler's employment.[19] Therefore it did not pay Distler any commissions on those orders.

### 2. Robert Babich

From September 15, 1999 to April 30, 2001, Babich worked as a pre-sales systems consultant and (like Distler) a solutions developer in AS/400. The "Terms of Employment Offer" for Babich provided that he "may be eligible for an annual Performance Bonus," that "annual Performance Bonuses will be paid after the end of the fiscal Year (on July 15) after the financial results of DSI's Fiscal Year are determined" and that "[y]ou must be employed with DSI on that date in order to qualify to receive [the] bonus." *Defendant's Brief* (Doc. # 40) ¶ 56.

The record is not crystal clear, but apparently the "Terms of Employment Of-

fer" for Babich mirrored the solutions development compensation plan which was in effect when he was hired. Babich earned annual performance bonuses from September 1999 to January 2001. On January 24, 2001, through Rockeman's announcement, Babich learned that under the 2001 Comp Plan, solutions developers would receive five per cent commissions on gross profits instead of performance bonuses. As previously noted, the 2001 Comp Plan provided that commissions would be earned when:

- Cash for the transaction has been received by DSI
- DSI understands and agrees to any and all cost incurred as part of the transaction
- No outstanding contingencies exists [sic] that could alter the terms of the transaction or cause DSI to refund or credit all or part of the money received.

*Defendant's Brief* (Doc. # 40) ¶ 57. As noted, Rockeman's announcement did not state that to receive a commission, a solutions developer had to be employed on the date of customer payment. DSI did not inform Babich of the condition until April 8, 2001, when Rockeman e-mailed the plan to Babich. Neither the 2001 Comp Plan nor Rockeman's announcement stated that the employee had to earn the commission solely in 2001. Babich did not sign the 2001 Comp Plan, nor did he orally agree to any requirement that he be employed by DSI on the date of customer payment or that commissions be earned solely in 2001.[20]

In 2000 and 2001 Babich solicited business from Autoliv ASP. In the first quarter of 2001 he obtained an order for which DSI received payment on February

---

**18.** The record does not reveal whether Distler actually received any commissions under the 2001 Comp Plan.

**19.** DSI has not received one payment from SYSCO.

**20.** The record does not reveal whether Babich actually received any commissions under the 2001 Comp Plan.

8, 2001. Before April 30, 2001, Babich solicited business orders from Pliant Corporation and Ridge Tool. DSI received payment on these two orders after it terminated Babich's employment and it did not pay him commissions on those orders.

### 3. John Winger

From June 2, 1997 to April 30, 2001, Winger worked a client solutions executive in the sales and marketing division.

The "Terms of Employment Offer" for Winger specified that in addition to salary and draw, he would receive commissions payable on the 15th of the month after DSI received customer payment. *See* Tab 11 in *Defendant's Exhibits* (Doc. # 41). Winger earned commissions under The Sales Plan Guidelines for Client Solutions Executives ("2001 Executive Sales Plan"), which was identical to the 2001 Comp Plan but also included the following language:

> *Termination/Resignation*
>
> Commissions not earned by the Client Solutions Executive (e.g. customer has not yet paid) as of the last day of employment are not allowed.

*Id.* ¶ 58.

During early 2001, Winger solicited and obtained an order from Ball which was consummated but not closed before April 30. Shortly after Winger's termination, Michael Murphy, who was director of the central region, confirmed that DSI would pay Winger's commission on this order if he facilitated the closing of the deal.[21] Winger thereafter communicated with Ball to facilitate the closing.[22] On June 12, 2001, Matt McGraw, senior vice president of client services, orally reaffirmed to Winger that DSI would pay his commission. DSI received payments from Ball in June and July of 2001 but it did not pay Winger's commission—which according to the DSI commission formula would have been $17,339.70.

At the time of the terminations on April 30, DSI had instructed its managers that: Commissions/Bonuses—will be paid according to the documented commission or Bonus Plan that applies to each employee. There are no exceptions to these plans!

\*　　\*　　\*　　\*　　\*　　\*

Client Solutions Executive—Commissions are earned when 1) cash for all transactions has been received by DSI . . .

Tab 1, G in *Defendant's Exhibits* (Doc. # 41). DSI did not expressly authorize managers to deviate from the 2001 Executive Comp Plan without written approval of the chief financial officer or chief executive officer. *See Baldwin Affidavit*, ¶¶ 86–87 Tab 21 in *Data Systems International, Inc.'s Reply Brief In Support Of Its Motion For Summary Judgment* ("*Reply Brief*") (Doc. # 56) filed September 10, 2002.

### 4. Scott Strange

For four months, from January to April 30, 2001, Strange worked as a CRM software associate in the client services group at the Overland Park site. His "Terms of Employment Offer" provided that Strange worked under the "Billable Bonus and Compensation Plan," which stated that he might be eligible for bonuses based on personal and company performance with "80% of the bonuses [to] be paid throughout the year in quarterly payments, and 20% [to] be paid as a year-end bonus." The plan also stated that "[b]onuses will be

---

**21.** The record does not reveal the date when Murphy orally affirmed that DSI would pay Winger a commission on the Ball order; it indicates only that the confirmation occurred shortly after DSI terminated Winger.

**22.** The record does not indicate when Winger communicated with Ball.

paid on the 2nd pay period following the end of each fiscal quarter" and that the employee "must be an active DSI employee in good standing on the date bonuses are distributed to be eligible to receive a payment." *Defendant's Brief* (Doc. # 40) ¶ 60.

Pursuant to an executive management decision in January of 2001, DSI changed the payment date for quarterly bonuses from the second pay period after the end of the quarter (April 30) to the third pay period after the end of the quarter (May 15). DSI did not inform Strange that it had changed the payment date. Consequently, when it terminated his employment on April 30, Strange believed that he would receive a bonus. In fact, during the termination communications, he asked when he would receive his salary and bonus check. DSI did not pay Strange the quarterly bonus which it paid to other employees on May 15, 2001.

### 5. James Rubino

For four months, from January to April 30, 2001, Rubino worked as a consultant in the client services division at the Overland Park site. As with Strange, his "Terms of Employment Offer" provided that he worked under the "Billable Bonus and Compensation Plan," which stated that he might be eligible for bonuses and that "[b]onuses will be paid on the 2nd pay period following the end of each fiscal quarter" and that employees "must be an active DSI employee in good standing on the date bonuses are distributed to be eligible to receive a payment." *Defendant's Brief* (Doc. # 40) ¶ 60. DSI did not inform Rubino that in January of 2001, it had changed the bonus payment date from April 30 to May 15. Therefore, when he

was terminated, Rubino believed that he would receive a bonus. During the termination communications, he asked when he would receive his salary and bonus check. DSI did not pay Rubino a quarterly bonus on May 15, 2001.

### D. Claims

All eight plaintiffs allege that DSI violated the WARN Act by terminating 50 or more employees at the Overland Park site without giving the required statutory notice. *See Pretrial Order* (Doc. # 47) filed July 3, 2002 § 2. DSI claims that it only terminated 44 employees at the Overland Park site and that its conduct did not trigger the notice requirement.

Three plaintiffs (Distler, Winger and Babich) allege that DSI breached their commission contracts and assert claims for breach of contract, *quantum meruit* and violation of the Kansas Wage Payment Act, §§ 44–315(a) and 44–342(a). DSI denies that it owed commissions to the three employees.

Two plaintiffs (Strange and Rubino) allege that DSI breached their bonus contracts and assert claims for breach of contract and *quantum meruit*. Because it did not employ them when it paid bonuses on May 15, DSI claims that it did not owe bonuses to Strange and Rubino.

### Analysis

### I. WARN Act

 Under certain conditions, the WARN Act requires a covered employer to provide written notification to affected employees or their representatives 60 days before a "plant closing" or "mass layoff" at a single site of employment. *See* 29 U.S.C. § 2102(a).[23] Employers who do not provide

---

**23.** Only two types of events, "plant closings" and "mass layoffs," trigger the notification requirements. 29 U.S.C. §§ 2102(a)(2) and (3). A "mass layoff" refers to a reduction in force which results in an employment loss at a single site of employment during any 30–day period for 50 or more employees who comprise at least 33 per cent of the total

the requisite notice must compensate employees who suffer an employment loss for each day of the violation. *See Hooper v. Polychrome, Inc.*, 916 F.Supp. 1111, 1115 (D.Kan.1996). The purpose of the WARN Act is to "provide protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs." 20 C.F.R. § 639.1(a) (1998). Advance notice allows workers and their families "time to adjust to the prospective loss of employment, seek and obtain alternative jobs, and if needed, enter skill training or retraining programs." *Id.*

Plaintiffs allege that DSI violated the WARN Act by terminating 50 or more employees at the Overland Park site without giving the required statutory notice. *See Pretrial Order* (Doc. # 47) filed July 3, 2002 § 2. DSI admits that it is subject to the WARN Act but argues that it is entitled to summary judgment because its reduction in force did not constitute a "plant closing" or cause a loss of 50 or more employees at a single employment site, and therefore did not trigger the statutory notification requirements.

The WARN Act defines a "plant closing" as follows:

> the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2101(a)(2); *see Frymire v. Ampex Corp.*, 61 F.3d 757, 764 (10th Cir. 1995). Plaintiffs claim that the terminations constituted a plant closing because (1) DSI shut down the CHR unit nation-wide by reassigning 19 employees and terminating 73 employees—36 who worked at Overland Park and 12 who were outstationed from Overland Park; (2) DSI shut down the CRM unit (which existed only at Overland Park) by terminating five of its six employees; and (3) six additional employees at Overland Park lost their jobs as a result of the CHR and CRM shutdowns. In short, plaintiffs claim that the CHR and CRM shutdowns resulted in employment loss for 59 employees at the Overland Park site. *See Pretrial Order* (Doc. # 47), Plaintiffs' Factual Contentions ¶¶ 1–5.

Under the WARN Act, an "operating unit" is "an organizationally or operationally distinct product, operation, or specific work function within or across facilities at the single site." 20 C.F.R. § 539.3(j). The parties dispute whether the CHR unit at Overland Park was an "operating unit." Plaintiffs argue that from January to April 2001, DSI had four principal "operating units," including CHR, and that CHR was an operationally distinct group of employees. *Hernandez Affidavit*, ¶ 151. DSI argues that it is entitled to summary judgment on this point because CHR was a *task* performed by employees in different subdivisions and not an operating unit. *Id.* DSI admits that CRM was a subdivision of the client services division, but claims that it was not an essential function or operating unit. *See Baldwin Affidavit* ¶ 26, Tab 1 in *Defendant's Exhibits* (Doc. # 41).

Viewed in the light most favorable to plaintiffs, the record reveals a genuine issue of material fact whether CHR and CRM were operating units. DSI is not entitled to summary judgment on its claim that CHR and CRM were not organizationally or operationally distinct operations or work functions at the Overland Park

number of employees at that particular site. *Frymire,* 61 F.3d at 765 (citing 29 U.S.C.

§ 2101(a)(3)). The "mass layoff" provision is not at issue here.

site. The Court must therefore address DSI's claim that as a matter of law the CHR and CRM shutdowns did not result in employment loss for 50 or more employees at the Overland Park site. The parties agree that 46 of the 59 employees who are at issue in this case were assigned to Overland Park.[24] Plaintiffs allege that in addition to these 46, DSI had 12 employees who were outstationed from Overland Park and one additional employee (Dickerman) who was stationed at Overland Park so that in all, DSI terminated 59 employees from the Overland Park site.[25] DSI argues that the 12 "outstationed" employees were assigned not to Overland Park but to other locations throughout the country (including home offices) and that two Overland Park employees (Elmquist and Lanigan) were never terminated.

## A. The 12 "Outstationed" Employees

Plaintiffs first argue that 12 employees (Allen, Ellis, Garcia, Jonas, Kinnear, Marti–Dykes, Pierce, D. Robinson, S. Robinson, Sharbrough, Sutherland and Winger) who lived and worked at noncontiguous locations throughout the United States should be counted as employees at the Overland Park site. Specifically, plaintiffs claim that the 12 employees were outstationed from Overland Park because it was their home base; they shared the staff, equipment and operational purpose of Overland Park employees; their supervisors were at Overland Park; they traveled to Overland Park; their work was assigned from Overland Park; and they reported to Overland Park. DSI asserts that the 12 employees were assigned only to the home or regional offices in which they worked. Specifically, DSI claims that their employment sites were home offices (Garcia, Marti–Dykes, Pierce, D. Robinson, S. Robinson, Sutherland and Winger) and DSI regional offices (Allen, Ellis, Jonas, Kinnear and Sharbrough).

Plaintiffs rely on 20 C.F.R. § 639.3(i)(6), which provides that

[f]or workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites ..., the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

Plaintiffs point out that "[i]n promulgating [20 C.F.R. § 639.3(i)(6) ], the Department of Labor indicated it was concerned about 'traveling workers who report to but do not work out of a particular office.' " *Teamsters Local Union 413 v. Driver's, Inc.,* 101 F.3d 1107, 1110 (6th Cir.1996); *see also Wiltz v. M/G Transp. Servs., Inc.,* 128 F.3d 957, 961–63 & n. 10 (6th Cir.1996) (recognizing that altered work locations are essential for application of regulation). Plaintiffs argue that noncontiguous or geographically separate employees may be included in a single site of employment if they meet the criteria listed in Subsection 6 and that for 12 employees who were outstationed from Overland Park, their primary site of employment was Overland

---

**24.** This figure includes 44 employees who the parties agree are counted for purposes of the WARN Act and two employees (Elmquist and Lanigan) whose employment DSI denies terminating.

**25.** Plaintiffs proffer the alternative argument that DSI maintained a truly unusual organizational situation, requiring the inclusion of certain employees in the number terminated from the Overland Park site. Plaintiffs provide no support for this argument, however, and the record does not suggest that DSI had a "truly unusual organizational situation" as defined by WARN Act regulations. 20 C.F.R. § 639.3(i).

Park. Specifically, plaintiffs claim that for these 12 employees:

1. Their assignments came directly from their immediate and primary supervisors, who were located at the Overland Park site;[26]
2. They reported to the Overland Park site;[27]
3. They did not utilize space outside their homes other than the Overland Park site;[28]
4. Their so-called home offices were indistinguishable from the home offices of employees who DSI conceded were stationed at Overland Park;
5. They had telephone extensions at the Overland Park site which were identical to those provided to employees who DSI conceded were stationed at the Overland Park site; and
6. Their home base was the Overland Park site.

DSI argues that Subsection 6 does not apply because each employee's "regular employment site" was a home office or DSI regional office. Furthermore, DSI argues that the 12 employees were not outstationed because their duties did not require them to "travel from point to point," and while they engaged in substantial travel, they left from and returned to their home offices or DSI regional offices, *i.e.* their regular employment sites.

▇▇▇ The WARN Act does not define a "single site of employment." Whether multiple work locations constitute a "single site of employment" is a mixed question of law and fact. *See Viator v. Delchamps, Inc.,* 109 F.3d 1124 (5th Cir.1997); *Frymire,* 61 F.3d at 765. In interpreting the phase "single site of employment," courts must look at the legislative history of the WARN Act and the regulations promulgated by the Secretary of Labor. *See* 29 U.S.C. § 2107. The regulations must be given controlling weight unless they are arbitrary, capricious or manifestly contrary to the statute. *Ciarlante v. Brown & Williamson Tobacco Corp.,* 143 F.3d 139, 145 (3d Cir.1998); *see Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). WARN Act regulations provide:

(1) A single site of employment can refer either to a single location or a group of contiguous locations. Groups of structures which form a campus or industrial park, or separate facilities across the street from one another, may be considered a single site of employment. * * *

(3) Separate buildings or areas which are not directly connected or in immediate proximity may be considered a single site of employment if they are in reasonable geographic proximity, used for the same purpose, and share the same staff and equipment. An example is an employer who manages a number of warehouses in an area but who regularly shifts or rotates the same employees from one building to another.

(4) Non-contiguous sites in the same geographic area which do not share the

---

26. Plaintiffs do not claim that Dickerman was outstationed, so they do not discuss where his assignments came from or where his supervisor was located.

27. Plaintiffs make this claim but do not cite specific evidence that the 12 employees reported to Overland Park. The facts say that their supervisors were at Overland Park.

28. In their argument, plaintiffs do not distinguish between the seven employees who used home office space and the five employees who used DSI regional office space. In their facts, however, plaintiffs state that Allen used DSI office space in Houston, Ellis occasionally used DSI office space in San Antonio, and Jonas and Kinnear used DSI office space in Dallas. Plaintiffs claim that Sharbrough did not use DSI office space in Dallas.

same staff or operational purpose should not be considered a single site. For example, assembly plants which are located on opposite sides of town and which are managed by a single employer are separate sites if they employ different workers.

(5) Contiguous buildings owned by the same employer which have separate management, produce different products, and have separate work forces are considered separate single sites of employment.

(6) For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes. * * *

(8) The term "single site of employment" may also apply to truly unusual organizational situations where the above criteria do not reasonably apply. The application of this definition with the intent to evade the purpose of the Act to provide notice is not acceptable.

20 C.F.R. § 639.3(i). "Taken together, these regulations suggest that proximity and contiguity are the most important criteria for making single site determinations. They, in fact, establish whether a site will be presumed a single or multiple site." *Frymire,* 61 F.3d at 766.

In *Frymire,* defendant terminated 85 plaintiffs from two facilities in Colorado Springs, Colorado. Plaintiffs claimed that the two facilities constituted a single site of employment and that they were therefore entitled to advance notice under the WARN Act. *See id.* at 762. The parties agreed that the two facilities, which were near-contiguous buildings, could constitute two separate sites if each had separate management and work forces and produced different products, but they disagreed whether those circumstances existed. *See id.* at 766. Following a bench trial, the district court held that the two facilities had different managers, department heads, controllers, quality control, engineering, operations, secretarial support and purchasing material, and made different products. *See id.* at 765. It therefore concluded that they constituted separate sites of employment and determined that defendant had violated the WARN Act by failing to give statutory notice to employees at one of those facilities.[29] On appeal, the Tenth Circuit affirmed the determination that the two facilities constituted two separate sites.[30]

On appeal, the Tenth Circuit noted that the primary issue was whether the district court had properly determined that the two facilities constituted separate sites of employment. Because the WARN Act does not define a "single site of employment," the Tenth Circuit turned for guidance to the rules promulgated by the Secretary of Labor. *Id.* at 765–66 (quoting 20 C.F.R. § 639.3(i)). The Tenth Circuit held that:

> Taken together, these regulations suggest that proximity and contiguity are the most important criteria for making single site determinations. They, in fact, establish whether a site will be presumed a single or multiple site. However, once a court makes the contiguous/noncontiguous determination the

---

**29.** Defendants did not violate the WARN Act as to the other facility because the number of employees who were laid off at that facility did not meet the statutory threshold.

**30.** The Tenth Circuit affirmed in part, reversed in part and remanded with instructions. The issues regarding the reversal and remand are not relevant to the present case.

operational, managerial and labor variables become the decisive factors and can defeat or reinforce the presumptions established by the proximity and contiguity factors.

*Frymire*, 61 F.3d at 766.[31] Taking into account those operational, managerial and labor variables, the Tenth Circuit upheld the district court's determination that the two facilities constituted two separate sites—although it noted that the case presented "close facts." 61 F.3d at 766–67.

In *Hooper v. Polychrome, Inc.*, 916 F.Supp. 1111 (D.Kan.1996), this Court addressed a similar issue whether noncontiguous facilities constituted a single site of employment under the WARN Act. In *Hooper*, the two facilities were 27 miles apart in Kansas and Missouri. For purposes of defendant's summary judgment motion, the Court therefore presumed that the two facilities were separate sites of employment. It then examined the *Frymire* factors: "(1) generally separate management; (2) the absence of common employees between the two corporations; and (3) the fact that the two plants were separate corporations which produced distinct products." *Id.* at 1116. In so doing it held that "[s]hifting, rotating, or sharing of a shared workforce on a regular basis ... contemplates the regular exchange of employees who perform the same or similar operational functions," 916 F.Supp. at 1117, and that the use of isolated pieces of equipment or the transporting of prototype parts did not evidence shared equipment at a level sufficient to suggest a "single site." *Id.* The Court found that even though the two facilities had some overlap of management, they were largely managed separately, and employees were not shifted or rotated between facilities on a regular basis. The record contained no evidence that equipment which was integral to daily operation was shared between facilities. *See id.* The Court therefore held as a matter of law that the two facilities were separate sites of employment under the WARN Act.

Even though an employee works at more than one site, he is assigned to only one site for purposes of the WARN Act: the employee's home base, the site from which his work is assigned or the site to which he reports. 29 C.F.R. § 639.3(i)(6); *see Ciarlante*, 143 F.3d at 149. Under Section 639.3(i)(6), Overland Park is the single site of employment for the 12 employees if it is (1) their home base, (2) the place where their work is assigned, *or* (3) the place to which they report. The record does not indicate the location from which the 12 employees received day-to-day instructions (if indeed, they received day-to-day instructions) or expressly identify the location to which they reported. It does establish that their supervisors were at Overland Park and, giving plaintiffs the benefit of all favorable inferences, it appears that their work was assigned from Overland Park and that they reported to Overland Park. Therefore, even if their "home bases" were noncontiguous, the regulations would arguably assign these employees to Overland Park.[32]

---

31. *See also Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir.1996) (sites need not be contiguous but must be connected in some respect); *Williams v. Phillips Petro. Co.*, 23 F.3d 930, 934 (5th Cir.1994) (Houston and Bartlesville plants, located in different states and hundreds of miles apart, not single site); *Int'l Union, United Mine Workers v. Jim Walter Res., Inc.*, 6 F.3d 722, 725 (11th Cir.1993) (common thread in determining single site is geographic contiguity and operational connection).

32. Section 6 makes clear that an employee is assigned to only one employment site for purposes of the WARN Act, but it is not particularly helpful in determining what that single site should be. As noted, it apparently permits an employee to be assigned to one of three sites (the employee's home base *or* place where work is assigned *or* place to which the

Under Tenth Circuit case law, the Court's analysis begins with the observation that only one of the 12 employees (Sharbrough) utilized office space at Overland Park; 11 of the 12 employees worked at home or regional offices which were noncontiguous and geographically remote from Overland Park. Under *Frymire,* the Court initially presumes that DSI assigned these 11 employees to employment sites which were separate from the Overland Park site. *See Frymire,* 61 F.3d at 766; *Hooper,* 916 F.Supp. at 1116. To determine whether this presumption could be overcome at trial, the Court next examines: (1) management variables, (2) labor variables and (3) product variables. As noted, all 11 employees were managed by supervisors who were located at Overland Park; they apparently had no supervision at their noncontiguous sites. Second, all 11 employees traveled to Overland Park, had telephone extensions at Overland Park, accessed the DSI computer system at Overland Park and received staff support from Overland Park. Finally, although the 11 employees did not manufacture a "product," they solicited and serviced DSI customers—duties which they shared with employees at Overland Park. For this reason, they presumably shared the same objectives and operational purposes of the CHR employees at the Overland Park site.[33] Based on these facts and giving plaintiffs the benefit of all favorable inferences, one could reasonably infer that notwithstanding their noncontiguous locations, the 11 employees were assigned to the Overland Park site of employment.

Giving plaintiffs the benefit of all reasonable inferences, it also appears that Sharbrough was assigned to Overland Park. Sharbrough was managed from Overland Park, used office space at Overland Park, performed duties similar to those of other CHR employees at Overland Park, and supervised CHR employees in the field and at Overland Park.

In short, the record reveals a genuine issue of material fact whether the 12 outstationed employees were assigned to Overland Park or to noncontiguous locations throughout the United States.

## B. Kim Dickerman

Plaintiffs argue that Dickerman regularly utilized office space at the Overland Park site and that he should be counted with the other employees who were terminated from the Overland Park site. DSI argues that as a matter of law, Dickerman should be excluded because he was terminated from its office in Oak Brook, Illinois.[34]

Hernandez presents affidavit testimony that Dickerman's site of employment was Overland Park and that from January through April of 2001, he regularly used office space there. *See Hernandez Affidavit,* ¶¶ 24–26. The affidavit of Mark Baldwin, chief financial officer and general counsel for DSI, states that several months before the terminations on April 30, DSI transferred Dickerman to Oak Brook. *See Baldwin Affidavit,* ¶ 77 Tab 21 in *Defendant's Reply* (Doc. # 56). The DSI organizational chart dated April 26,

employee reports) without offering useful guidance concerning the analysis when these locations are not the same. For purposes of this motion, the Court assumes that Section 639.3(i)(6) would assign the 12 employees to the Overland Park site.

33. The record does not reveal anything about the customers who they serviced or whether

employees in the field supported the same customers as those at Overland Park.

34. DSI does not specifically seek summary judgment on this issue, but it argues that Dickerman should be excluded and the Court infers that it seeks that adjudication as a matter of law.

2001 states that Dickerman was located in Illinois. *See* Tab A in *Defendant's Exhibits* (Doc. # 41). In view of the Hernandez affidavit, however, the record reveals a genuine issue of material fact on this question. The Court cannot conclude as a matter of law that Dickerman should be excluded in evaluating DSI's duties under the WARN Act. *See Windon Third Oil & Gas Drilling P'ship v. Fed. Deposit Ins. Corp.*, 805 F.2d 342, 346 (10th Cir.1986); *Gonzales v. City of Topeka, Kan.*, 223 F.Supp.2d 1223, 1227 (D.Kan.2002) (summary judgment motion does not empower court to act as jury and determine witness credibility, weigh evidence or choose between competing inferences).

### C. Michael Elmquist And Matt Lanigan

▇ Plaintiffs include Elmquist and Lanigan in their WARN Act computations because they worked at the Overland Park site and were terminated on April 30. DSI apparently seeks summary judgment on this issue,[35] arguing that Elmquist and Lanigan should be excluded because even though it terminated their employment on April 30, their terminations were mistakes which it rectified by rehiring them on May 16 and 17, 2001 with full back pay and benefits.[36]

Under the WARN Act an "employment loss" means "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U.S.C. § 2101(a)(6). The Department of Labor has explained that the word "termination" is to have its

common sense meaning as the "permanent cessation of the employment relationship." 54 Fed.Reg. 16,047 (1989). Whether in the context of a sale, plant closing or mass layoff, Courts addressing Section 2101(a)(6) have applied a "practical, effects-driven analysis of whether a break in employment actually occurred to trigger the notification requirements of the WARN Act." *Wiltz*, 128 F.3d at 964. Where the termination is technical at best, courts have found no WARN Act violation. *See Rifkin*, 78 F.3d at 1282–83 (no termination where employer rehired laid off employees); *Gonzalez v. AMR Servs. Corp.*, 68 F.3d 1529, 1530–31 (2d Cir.1995) (no employment loss for employees placed in other positions with no break in service); *Int'l Alliance of Theatrical & Stage Employees & Moving Picture Mach. Operators v. Compact Video Servs., Inc.*, 50 F.3d 1464, 1465–68 (9th Cir.1995) (WARN not implicated in sale of business despite termination letter from seller and requirement that employees apply for employment with buyer where buyer offered employment to 309 of 314 employees of seller); *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1280–81 (10th Cir.1994) (no termination where employees immediately rehired and never faced need to find new jobs).

The purpose of the WARN Act is "to ensure adequate opportunities (by way of notice of imminent employment loss) for retraining and/or reemployment." *Moore v. Warehouse Club, Inc.*, 992 F.2d 27, 30 (3d Cir.1993). An employee who is laid off and rehired within six months does not fall within the purpose of the WARN Act because there is no need to "adjust to the prospective loss of employment, to seek

---

**35.** DSI does not specifically seek summary judgment on this issue, but it argues that Elmquist and Lanigan should be excluded and the Court infers that it seeks an adjudication as a matter of law.

**36.** The record does not indicate the nature of the alleged mistake.

and obtain alternative jobs and, if necessary, to enter skills training or retraining." 20 C.F.R. § 639.1(a).

In *Martin v. AMR Servs. Corp.*, 877 F.Supp. 108 (E.D.N.Y.1995), *aff'd sub nom., Gonzalez v. AMR Servs. Corp.*, 68 F.3d 1529 (2d Cir.1995), plaintiffs argued that they were "terminated" rather than "laid off" and that the distinction lay in the employee's subjective belief that he or she would not be reemployed. 29 C.F.R. § 639.3(a)(1) specifies that

> [w]orkers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. An employee has a "reasonable expectation of recall" when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or to a similar job.

Here, DSI terminated Elmquist and Lanigan on April 30, 2001, other than for cause, voluntary departure or retirement. While the record indicates that DSI terminated their employment due to internal restructuring, it does not indicate that their terminations were merely lay-offs, that Elmquist or Lanigan expected to be recalled, or any other information about DSI or industry practice regarding terminations and lay-offs. Thus, the Court cannot conclude as a matter of law that Elmquist and Lanigan should be excluded in evaluating DSI's duties under the WARN Act.

In sum, viewing the evidence in the light most favorable to plaintiffs, genuine issues of material fact exist whether the CHR and CRM shutdowns resulted in an employment loss at Overland Park for 50 or more employees. The Court therefore overrules defendant's motion for summary judgment on plaintiffs' WARN Act claims.

## II. Breach Of Contract Claims For Failure To Pay Commissions And Bonuses

As noted, five plaintiffs (Distler, Winger, Babich, Rubino and Strange) assert claims for breach of contract. *Pretrial Order* (Doc. # 47), Plaintiffs' Factual Contentions ¶ 6. Distler, Winger and Babich allege that DSI breached its agreement to pay commissions for sales of hardware and services. Strange and Rubino allege that DSI breached its agreement to pay bonuses in accordance with "Terms of Employment Offers" which state that "[b]onuses will be paid on the 2nd pay period following the end of each fiscal quarter." *Pretrial Order* (Doc. # 47), Plaintiffs' Factual Contention ¶ 7.

DSI argues that as a matter of law plaintiffs did not earn commissions or bonuses under well-documented policies of DSI. Specifically, DSI argues that no commission was due until DSI received customer payment; that to receive commissions, employees had to be employed on the date of customer payment; that to receive bonuses, employees had to be employed on the bonus payment date; and that the 2001 Comp Plan applied only to orders for new business in 2001.

### A. Commissions

DSI argues that it is entitled to summary judgment on the breach of contract claims of Distler, Winger and Babich because plaintiffs did not satisfy DSI's well documented conditions precedent to their rights to commissions. DSI argues that its written policies stipulated that commissions were not earned until it received customer payment, that it only paid commissions for new business, and that plaintiffs' employment offers imposed upon it no greater obligation with regard to payment of commissions.[37]

---

**37.** DSI notes without any argument the fact that the "Terms of Employment Offers" for all three employees included the following notice:

### 1. Solutions Developer Commissions

Distler and Babich, who were solutions developers, each swear that DSI "entered into a Commission Contract with me in which Defendant promised to pay me commissions for sales of Defendant's products made by me," and that "[t]he terms of the Commissions Contract were: Quarterly payment of 5% of the gross margin per engagement." *Distler Affidavit,* ¶ 2 Tab 4 and *Babich Affidavit,* ¶ 2 Tab 10 in Vol. II *Brief In Opposition* (Doc. # 51).

Neither affidavit says anything more about the creation or terms of the alleged contracts (*i.e.* the date of the contract, who made it, what terms were bargained for, what consideration was given, when commissions were to be paid, whether an employee had to be employed on the date of customer payment to receive a commission, or how the alleged contract related to the 2001 Comp Plan).[38] Neither affidavit claims that the alleged terms were the only terms, or whether the contract was oral or written. DSI however, does not seek summary judgment regarding the existence or general enforceability of these oral contracts.

### a. Distler

 DSI argues that it is entitled to summary judgment on Distler's commission claim because he did not work for DSI on the date when it received cash for the transactions. As noted, Distler obtained orders from Ball, SYSCO and Forest T. Jones before April 30. DSI did not receive payment until after it had terminated Distler's employment.

The "Terms of Employment Offer" for Distler did not mention commissions. *See* Tab 16 in *Defendant's Exhibits* (Doc. # 41). Under the 2001 Comp Plan, DSI agreed to pay Distler and other solutions developers certain commissions which were payable when (1) cash for the transaction had been received by DSI; (2) DSI agreed to all costs incurred as part of the transaction; and (3) no outstanding contingencies could alter the terms of the transaction or cause DSI to refund or credit all or part of the money received. *See Defendant's Brief* (Doc. # 40) ¶ 57. The 2001 Comp Plan specifically included a condition that "[c]ommissions NOT earned ... (e.g. customer has not yet paid) as of the last day of employment are not allowed." *Id.* In response to DSI's motion for summary judgment, Distler argues that (1) as a sales commission, DSI promised him "quarterly payment of 5% of the gross margin per engagement," and (2) prior to April 8, 2001, he did not know that under the 2001 Comp Plan, a solutions developer had to be employed on the date of customer payment to earn a commission. *Distler Affidavit,* ¶¶ 1, 2 and 9. Distler claims that under the circumstances, he acquired an absolute right to commissions which accrued during the first quarter of 2001, and that DSI's effort to require employment on the date of customer payment constitutes an unlawful forfeiture under K.S.A. § 44–315.

*Defendant's Brief* (Doc. # 40) ¶ 59.

---

*Important:*
Bonuses and incentive compensation, if any, is paid solely at the discretion of DSI Management. The amount of funding and criteria for determining individual bonus allocations is subject to fluctuation and change along with changing business interests of DSI and possible fluctuations in the financial performance of the company as a whole. Salary and merit increases and company benefits policies are subject to change without notice.

38. The Babich and Distler affidavits state that Rockeman announced the 2001 Comp Plan in January of 2001 and that under the plan solutions developers would receive a five per cent commission on gross profits instead of receiving bonuses, but they do not assert that this announcement embodied the terms of the alleged commission contracts. *See Distler Affidavit,* ¶ 8; *Babich Affidavit,* ¶ 3.

The Court disagrees. Distler was not a commissioned employee until January of 2001. Since his "Terms of Employment Offer" did not entitle him to commissions, any entitlement came from the 2001 Comp Plan or the alleged "Commission Contract." Distler cannot claim the benefits of the 2001 Comp Plan without also accepting the conditions precedent to his right to benefits thereunder. *See Dutton v. Dutton*, 113 Kan. 146, 213 P. 326, 328 (1923) (party cannot hold some contract benefits and at same time evade its disadvantages); *Joyce v. Davis*, 539 F.2d 1262 (10th Cir. 1976) (party may not both affirm and disaffirm contract or affirm in part and disaffirm in part). The fact that before April 8, 2001 Distler did not receive a copy of the plan, or learn all of its terms, is irrelevant. The alleged "Commission Contract" is likewise no defense to DSI's motion for summary judgment. First, Distler's affidavit is too vague and conclusory to raise a genuine issue of material fact whether DSI agreed to pay commissions to Distler on conditions other than those articulated in the 2001 Comp Plan. For purposes of this motion, the Court therefore disregards it. *E.g., Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir.2002); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 855 (10th Cir.1999). Second, even taking Distler's affidavit at face value, the alleged promise does not purport to nullify the 2001 Comp Plan or vitiate well-established DSI policy regarding its liability for post-termination commissions.

Distler has not demonstrated that genuine issues remain for trial. The Court therefore sustains DSI's motion for summary judgment on Distler's breach of contract claims.

### b. Babich

Before April 30, 2001, Babich solicited and obtained orders from Plaint Corporation and Ridge Tool. DSI did not receive payment for these orders before it terminated Babich's employment, and it seeks summary judgment on the theory that Babich did not earn these commissions. DSI also seeks summary judgment on the Autoliv ASP order which Babich procured, arguing that it was not new business initiated in 2001 and that as a matter of law, Babich was not entitled to a commission under the 2001 Comp Plan.

### i. Plaint Corporation and Ridge Tool Commissions

The "Terms of Employment Offer" for Babich did not mention commissions. *See* Tab 13 in *Defendant's Exhibits* (Doc. # 41). Babich worked under the 2001 Comp Plan, which required current employment as a condition precedent to the right to receive commissions. For reasons outlined above, with regard to Distler, Babich has not demonstrated genuine issues of material fact regarding the Plaint Corporation and Ridge Tool commissions. The Court sustains DSI's motion for summary judgment on these claims.

### ii. Autoliv ASP Commission

 Babich claims that DSI owes him a commission on the Autoliv ASP order, which he solicited in 2000 and 2001 and for which DSI received payment on February 8, 2001. DSI argues that Babich did not earn a commission on the order because the 2001 Comp Plan only provided commissions for new business and, since Babich initially solicited Autoliv ASP in 2000, it was not new business in 2001. On its face, however, the 2001 Comp Plan does not state when business must be initiated to qualify for a commission. *See* Tab 14 in *Defendant's Exhibits* (Doc. # 41). The affidavit of Mark Baldwin, chief financial officer and general counsel, states that Babich was not eligible for a commission on the Autoliv ASP "because the business was instituted in 2000, before the new 2001 Sales Plan took effect." *Baldwin Affidavit*, ¶ 46 Tab 1 in *Defendant's Exhibits*

(Doc. # 41). DSI has not conclusively established that the 2001 Comp Plan only applied to business initiated solely in 2001. The Court therefore overrules DSI's motion for summary judgment on Babich's breach of contract claim regarding the Autoliv ASP commission.

### 2. Client Solutions Executive Commissions

■ The "Terms of Employment Offer" for Winger specified that in addition to salary and draw, he would receive commissions on the 15th of the month after DSI received customer payment. *See* Tab 11 in *Defendant's Exhibits* (Doc. # 41). Winger earned commissions under the Sales Plan for Client Solutions Executives, which stipulated that "[c]ommissions not earned by the Client Solutions Executive (e.g. customer has not paid) as of the last day of employment are not owed." Tab 15 in *Defendant's Exhibits* (Doc. # 41). Winger does not dispute the terms of the 2001 Executive Comp Plan, but asserts that after his termination DSI expressly promised to pay him a commission on the Ball order. Specifically, Winger claims that Murphy (director of the central region) and McGraw (senior vice president of client services) each promised that DSI would pay the commission, and that he relied on that promise in communicating with Ball to facilitate a closing of the transaction. DSI denies making such promises, and seeks summary judgment because it did not employ Winger on the date when it received customer payment.

Preliminarily, the Court notes that DSI cites no record evidence that it did not promise to pay the commission which Winger seeks to recover. The record does not contain affidavits from Murphy or McGraw, who allegedly made the promises. The affidavit of Mark Baldwin, chief financial officer and general counsel, speculates that Murphy and McGraw would not

have made such promises because DSI instructed them that:

> Commissions/Bonuses—will be paid according to the documented commission or Bonus Plan that applies to each employee. There are no exceptions to these plans!

> \* \* \* \* \* \*

> Client Solutions Executive—Commissions are earned when 1) cash for all transactions has been received by DSI.

Tab 1, G in *Defendant's Exhibits* (Doc. # 41). DSI also claims that Murphy and McGraw could not deviate from the 2001 Executive Comp Plan without written approval of the chief financial officer or chief executive officer and that neither Murphy or McGraw obtained written or oral approval, *Baldwin Affidavit,* Tabl ¶¶ 86–87 in *Defendant's Exhibits* (Doc. # 41). Such evidence does not conclusively establish that Murphy and McGraw did not promise to pay Winger the commissions in question.

The record does reveal genuine issues of material fact whether DSI authorized Murphy and McGraw to make the alleged promises to Winger. *See generally Anheuser–Busch, Inc. v. Grovier–Starr Produce Co.,* 128 F.2d 146, 152 (10th Cir.1942) (principal bound by acts that agent committed within actual and apparent authority unless third person knows or has reason to believe acts exceed authority); *In re Scholastic Book Clubs, Inc.,* 260 Kan. 528, 538–39, 920 P.2d 947, 954–55 (1996) (discussing authority of agent); *Kan. City Heartland Constr. Co. v. Maggie Jones Southport Café, Inc.,* 250 Kan. 32, 35–38, 824 P.2d 926, 929–30 (1992) (same); *Stevens v. Stag Drilling, Inc.,* 173 Kan. 770, 771, 252 P.2d 616, 618 (1953) (whether act is within apparent scope of agent's authority is question of fact). Viewing the evidence in a light most favorable to Winger, Murphy and McGraw acted within the

scope of their actual or apparent authority in promising to pay Winger a commission on the Ball transaction.

DSI alternatively argues that it is entitled to summary judgment because Winger coerced any promises which were made to him and Winger had a preexisting obligation to facilitate the closing of the Ball order even after it terminated his employment. DSI cites no record evidence of coercion or of a preexisting post-termination obligation to facilitate the Ball closing. The Court therefore overrules DSI's motion for summary judgment as to Winger's breach of contract claim.

### B. Bonuses

█ DSI employed Strange and Rubino for four months, from January 2 to April 30, 2001. DSI seeks summary judgment on their breach of contract claims because according to the "Terms of Employment Offers" for each plaintiff, as well as DSI policy, an employee had to be an active DSI employee on the bonus payment date to be eligible to receive a payment. Strange and Rubino were not employed on May 15, 2001, when DSI paid bonuses for the first quarter of 2001, and DSI claims that as a matter of law it had no duty to pay bonuses to Strange and Rubino. Strange and Rubino agree that their eligibility for bonuses was subject to the "Billable Bonus and Compensation Plan" ("Bonus Plan") but note that under that plan, "[b]onuses will be paid on the 2nd pay period following the end of each fiscal quarter," in this case, April 30. *Defendant's Brief* (Doc. # 40) ¶ 60. Strange and Rubino do not dispute that a bonus can be conditioned upon continued employment, and they do not deny that DSI could prospectively change the Bonus Plan. Rather, they contend that DSI did not notify them of the change until after they were terminated (which was after the first quarter had ended) and that the change was a forfeiture and thus invalid. Strange and Rubino argue that they relied on the Bonus Plan that existed when they were hired, that they worked under the old plan during the first quarter of 2001, and that they were eligible for and should have received bonuses on April 30.

DSI relies solely on the fact that in January of 2001, it changed the bonus payment date from April 30 to May 15. It admits that Strange and Rubino did not receive notice of the change, but notes that the Bonus Plan states that "[b]onuses and incentive compensation, if any, is paid solely at the discretion of DSI Management." Tabs 17 and 18 in *Defendant's Exhibits* (Doc. # 41). It does not seek summary judgment on the theory that it properly exercised discretionary authority to withhold bonuses from Strange and Rubino, and the Court does not further address that issue.

█ Parties have wide discretion in fixing the terms of employment contracts, and when the employment contract is not contrary to the law or unreasonable in terms, it should be honored and enforced by the courts. *Weinzirl v. Wells Group, Inc.*, 234 Kan. 1016, 1019, 677 P.2d 1004, 1008 (1984). Kansas law permits an employer to impose a condition precedent on its obligation to pay an employee for wages; once an employee's right to earn wages becomes absolute, however, a condition subsequent cannot impose a forfeiture. *See Smith v. MCI Telecomm. Corp.*, 755 F.Supp. 354, 358 (D.Kan.1990) (citing *Weir v. Anaconda Co.*, 773 F.2d 1073, 1084 (10th Cir.1985)); *see also Weinzirl*, 234 Kan. at 1019, 677 P.2d at 1008–08; *Sweet v. Stormont Vail Reg'l Med. Ctr.*, 231 Kan. 604, 610, 647 P.2d 1274, 1279–80 (1984); *Morton Bldgs., Inc. v. Dep't of Human Res.*, 10 Kan.App.2d 197, 199–200, 695 P.2d 450, 453 (1985); *Yuille v. Pester Mktg. Co.*, 9 Kan.App.2d 464, 682 P.2d 676, 681 (1984).

█ In determining whether a wage is earned, a court's task is one of

deciding whether the documents drafted by the employer place a condition precedent on entitlement to the wage or whether they impose a forfeiture. *See* K.S.A. § 44–315(a); *Hart v. Sprint Comms. Co., L.P.*, 872 F.Supp. 848, 857 (D.Kan.1994); *Smith*, 755 F.Supp. at 358. Under Kansas law, a condition precedent is:

> something that is agreed must happen or be performed before a right can occur to enforce the main contract. It is one without the performance of which the contract entered into between the parties cannot be enforced. A condition precedent requires the performance of some act or happening of some event after the terms of the contract, including the condition precedent, have been agreed on before the contract shall take effect.

*Weinzirl*, 234 Kan. at 1019, 677 P.2d at 1008 (citations omitted).[39] In *Smith v. MCI Telecomms. Corp.*, the Court held that while K.S.A. § 44–315 permits an employer to impose a condition precedent on its obligation to pay wages, once an employee's right to earn wages becomes absolute, a condition subsequent is a forfeiture of earned wages which violates Section 44–315. *See id.* at 359–60.

Without question, the "Terms of Employment Offers" for Strange and Rubino, and the DSI Bonus Plan, included the condition of continued employment. Strange and Rubino claim that the payment date change was an invalid forfeiture, however, because DSI did not give

them notice of the purported change and throughout the first quarter they worked under a plan which required bonus payments on April 30. DSI responds that in changing the bonus payment date, it did not materially change the condition precedent.

■ A forfeiture that is imposed as a condition precedent—requiring that an employee give up a wage already earned—is valid. *See Sweet*, 231 Kan. at 606, 647 P.2d at 1281 (contractual requirement that employee give two weeks' notice of resignation, to be paid for unused vacation time, was a valid condition precedent). On the other hand, a forfeiture that is imposed as a condition subsequent—imposing the condition after the wage was already earned—is invalid. Although K.S.A. § 44–313(c) does not directly apply to this issue, implementing regulations articulate the general rule that "[c]onditions subsequent ... resulting in a forfeiture or loss of ... earned wage shall be ineffective and unenforceable." K.A.R. 49–20–1F; *see Weir*, 773 F.2d at 1083–84. Because DSI did not notify Strange and Rubino of the change in the bonus payment date, a jury might reasonably conclude that its secret decision did not effectuate a prospective change that was enforceable as to Strange and Rubino. Furthermore, a jury might reasonably conclude that any effort to retroactively implement the purported change constituted a forfeiture of bonuses which Strange and Rubino earned under the original Bonus Plan. On this record DSI is not entitled to summary judgment on the

---

**39.** In *Weinzirl*, the Kansas Supreme Court held that plaintiff had not earned commissions. Plaintiff's employer only received payment for the continued service of clients and continued service by plaintiff was a condition precedent to his right to commissions, *i.e.* "something that [was] agreed must happen or be performed before a right [could] occur to enforce the main contract." *Id.* at 1017, 677 P.2d at 1007; *see also Sweet*, 231 Kan. 604,

647 P.2d 1274 (condition precedent, such as giving two weeks notice of continued employment, was *determinative whether employee would be allowed* to reduce accrued fringe benefit to cash payment under employment contract); *Richardson v. St. Mary Hosp.*, 6 Kan.App.2d 238, 627 P.2d 1143 (1981) (same); *Benjamin v. Manpower, Inc. of Wichita*, 3 Kan.App.2d 657, 600 P.2d 148 (1979) (same).

breach of contract claims of Strange and Rubino.

### III. Kansas Wage Payment Act: Failure To Pay Commissions

Distler, Babich and Winger allege that DSI violated the Kansas Wage Payment Act, K.S.A. §§ 44–315(a) and 44–342(a), when it did not pay their commissions. DSI argues that it did not violate the statute because no commissions were due. Section 44–315(a) of the Kansas Wage Payment Act provides:

> Whenever an employer discharges an employee or whenever an employee quits or resigns, the employer shall pay the employee's earned wages not later than the next regular payday upon which he or she would have been paid if still employed.

The term "wages" is defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions." K.S.A. § 44–313(c).

DSI claims that it is entitled to summary judgment if it did not owe plaintiffs any wages. As noted above, DSI is entitled summary judgment on Distler's breach of contract claims and Babich's breach of contract claims regarding the Plaint Corporation and Ridge Tool commissions. Accordingly, DSI does not owe Distler or Babich wages on these claims. The Court therefore sustains DSI's motion for summary judgment on these claims under the Kansas Wage Payment Act.

The Court has overruled DSI's summary judgment motion as to Babich's

breach of contract claim regarding the Autoliv ASP commission and Winger's breach of contract claim. For reasons stated elsewhere, the Court cannot determine as a matter of law that DSI owed no wages to Babich and Winger in these respects. The Court therefore overrules DSI's motion for summary judgment on these Kansas Wage Payment Act claims.

### IV. Quantum Meruit Claims

Distler, Babich, Winger, Strange and Rubino assert claims of *quantum meruit* for unpaid commissions and bonuses. DSI argues that it is entitled to summary judgment on these claims because DSI did not receive a benefit from plaintiffs for which they were not paid.

Kansas courts interchangeably use the terms *quantum meruit* and unjust enrichment. *See Haz–Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 259 Kan. 166, 177, 910 P.2d 839, 846 (1996).[40] "The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him." *Id.* Under Kansas law, unjust enrichment requires proof of the following elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Id.* (quoting *J.W. Thompson Co. v. Welles Prods. Corp.*, 243 Kan. 503, 512, 758 P.2d 738, 745 (1988)).

---

**40.** The Kansas Supreme Court reiterated that [q]uantum meruit is an equitable doctrine. Restitution and unjust enrichment are modern designations for the older doctrine of quasi-contracts. The theory of quasi-contract is raised by the law on the basis of justice and equity regardless of the assent of the parties. The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him or her. *Haz–Mat Response,* 259 Kan. at 176, 910 P.2d at 846 (quotations and citations omitted).

DSI argues that plaintiffs' *quantum meruit* claims are frivolous and should be summarily rejected because plaintiffs did not earn the commissions or bonuses and DSI did not receive benefits for which plaintiffs were not paid. DSI also argues that a bonus is something in addition to what is expected or strictly due and that as such, it was not obligated to pay any bonus. Plaintiffs have not responded to DSI's motion for summary judgment on this issue. The Court construes plaintiffs lack of response as abandoning these claims and therefore sustains DSI's motion for summary judgment as to plaintiffs' *quantum meruit* claims.

## V. Plaintiffs' Motion For An Evidentiary Hearing Or Leave To Respond

On September 16, 2002, plaintiffs filed a motion for an evidentiary hearing or in the alternative, for leave to respond to defendant's reply to plaintiffs' brief in opposition to summary judgment. (Doc. # 60). Specifically, plaintiffs sought leave to conduct an evidentiary hearing or otherwise respond to Mark Baldwin's affidavit in DSI's reply brief. *See Defendant's Reply* (Doc. # 56) filed September 10, 2002. Plaintiffs claim that the Baldwin affidavit is less credible than the Hernandez affidavit which plaintiffs submitted in support of their brief in opposition. A summary judgment motion, however, does not empower the Court to act as the jury and weigh the evidence. *See Windon Third Oil & Gas Drilling P'ship*, 805 F.2d at 346; *Gonzales*, 223 F.Supp.2d at 1227. The Court therefore overrules plaintiffs' motion.

**IT IS THEREFORE ORDERED** that *Defendant Data Systems International, Inc.'s Motion For Summary Judgment* (Doc. # 39) filed July 12, 2002 be and hereby is **OVERRULED in part**. DSI is not entitled to summary judgment on plaintiffs' claims for violation of the WARN Act, 29 U.S.C. § 2101 *et seq.*, Ba-

bich's claims for breach of contract and violation of the Kansas Wage Payment Act, K.S.A. §§ 44-315(a) and 44-342(a) regarding the Autoliv ASP order, Winger's claims for breach of contract and violation of the Kansas Wage Payment Act, K.S.A. §§ 44-315(a) and 44-342(a) and the breach of contract claims of Strange and Rubino. DSI's motion for summary judgment is **SUSTAINED** as to Distler's claims for breach of contract and violation of the Kansas Wage Payment Act, K.S.A. §§ 44-315(a) and 44-342(a), Babich's claims for breach of contract and violation of the Kansas Wage Payment Act, K.S.A. §§ 44-315(a) and 44-342(a), regarding the Plaint Corporation and Ridge Tool orders, and plaintiffs' *quantum meruit* claims.

**IT IS FURTHER ORDERED** that *Plaintiffs' Motion For An Evidentiary Hearing Or In The Alternative For Leave To Respond To Defendant's Reply To Plaintiff's [sic] Brief In Opposition To Summary Judgment* (Doc. # 60) filed September 16, 2002 be and hereby is **OVERRULED**.